# CHARLESTON.

## KERR v. LUNSFORD.

Submitted June 22, 1888.—Decided Dec. 8, 1888.

1. WILL—*DEVISAVIT VEL NON*—BURDEN OF PROOF—ARGUMENT OF CAUSE.

Upon an issue *devisavit vel non* the proponents of the will have the affirmative of the issue and the right to open and conclude the argument. (p. 666.)

2. WILL—PROOF OF WILL—EVIDENCE—REBUTTAL.

In the trial of an issue *devisavit vel non* it is not improper for the proponents to offer the will and the evidence of its due execution and the competency of the testator at the time it was executed, and thus having made a *prima facie* case to rest; and after the contestants have offered their evidence against the validity of the will, it is proper to permit the proponents to offer other evidence to sustain the will as well as evidence in rebuttal. (p. 667 *et seq.*)

3. WILLS—EVIDENCE.

Upon the trial of such an issue the general question put to a witness: "Was there any one who influenced the testator?" is improper. (p. 669.)

4. WILLS—WITNESS—COMPETENCY OF HEIR.

Under chapter 130, § 23 of the Code, a person, who but for the will would inherit a part of the testator's property, is incompetent to speak of the testator's capacity to make the will. (p. 669.)

5. EVIDENCE—MEDICAL EXPERT—WEIGHT AND SUFFICIENCY—WITNESSES.

When a medical expert is asked to give his professional opinion to a jury not upon matters within his own knowledge but upon

| 31 | 659 |
| 32 | 125 |
| 33 | 58 |
| 33 | 83 |

| 31 | 659 |
| 34 | 170 |

| 31 | 659 |
| 35 | 499 |
| 35 | 508 |
| 35 | 601 |
| 35 | 669 |

| 31 | 659 |
| 37 | 52 |

| 31 | 659 |
| 38 | 173 |

| 31 | 659 |
| 39 | 101 |
| 39 | 373 |

| 31 | 659 |
| 40 | 747 |

| 31 | 659 |
| 42 | 240 |
| 42 | 458 |
| 42 | 723 |

| 31 | 659 |
| 43 | 684 |

| 31 | 659 |
| 45 | 542 |

| 31 | 659 |
| 47 | 88 |

| 31 | 659 |
| 49 | 611 |

| 31 | 659 |
| 52 | 126 |
| 52 | 127 |

| 31 | 659 |
| 53 | 162 |
| 53 | 232 |
| e53 | 255 |
| d53 | 256 |
| 53 | 258 |
| e53 | 262 |
| 53 | 263 |
| e53 | 266 |
| d53 | 269 |
| e53 | 301 |
| 53 | 554 |

| 31 | 659 |
| 54 | 676 |

| 31 | 659 |
| 55 | 84 |

| 31 | 659 |
| 56 | 204 |
| 56 | 313 |
| 56 | 524 |

| 31 | 659 |
| 62 | 695 |

| 31 | 659 |
| 66 | 659 |

a hypothetical case founded upon the testimony of witnesses previously examined in the case, the questions to him must be so shaped as to give him no occasion to mentally draw his conclusion from the whole evidence or a part thereof, and from these conclusions so drawn express his opinion, or to decide as to the weight of evidence or the credibility of witnesses; and his answers must be such as not to involve any such conclusion so drawn or any opinion of the expert as to the weight of the evidence or the credibility of witnesses. (p. 669 *et seq.*)

6. EVIDENCE—HYPOTHETICAL CASE—WITNESSES.

The opinion of medical experts founded on testimony already in the case can only be given on a hypothetical case; and the hypothesis must be clearly stated, so that the jury may know with certainty, upon precisely what state of assumed facts the expert based his opinion. (p. 672.)

7. EVIDENCE—ASSUMPTION OF FACTS—WITNESSES.

In putting hypothetical questions to expert witnesses counsel may assume the facts in accordance with their theory of them; it is not essential that they should state them as they exist; but the hypothesis should be based on a state of facts, which the evidence in the cause tends to prove. (p. 672.)

8. WILLS—REVERSAL OF DECREE—ERROR.

Where on a trial of an issue *devisavit vel non* a medical expert was permitted to answer two improper hypothetical questions, which he did, fully covering the whole case, and the court refused to permit him to answer two proper hypothetical questions, which embraced no more than the two he was permitted to answer, and the party who asked these proper hypothetical questions was not and could not have been prejudiced by the error, the appellate court will not for such error reverse the decree and set aside the verdict. (p. 674.)

9. WILLS—EVIDENCE—REVERSAL OF DECREE—ERROR.

Where in the trial of an issue *devisavit vel non* the contestants on the question of the testator's capacity offered a witness, who testified, that about three months before the execution of the will the testator had sold a property for $10,000.00, which was a very low price for it, and the proponents offered the purchaser of the property, who testified he had paid full value for it; and the contestants then offered a witness, who had occupied the property as lessee and testified he knew its value, and asked the witness: "What is the property worth?" and the proponents objected, and objection was sustained, and contestants excepted. *Held:* If error, it was not such error as rendered the judgment liable to be reversed. (Johnson, president, dissenting.) (p. 674 *et seq.*)

10. WILLS—RECORDS—EVIDENCE.

The record of an inquisition *de lunatico inquirendo* is admissible on the trial of an issue *devisavit vel non;* but where the court refused to permit to be read on such an issue such portion of the order of adjudication, as instructed the committee appointed as to the scope of his duties, *held,* no error. (p. 676.)

11. WILLS—STENOGRAPHER'S NOTES—EVIDENCE.

Where on the trial of such an issue a witness for contestants had testified, that the testator in giving his evidence in a certain action in ejectment was incoherent, and on cross-examination said he had the stenographer's notes of his evidence in the action, but that the stenographer was not sworn, but the witness said the notes were substantially correct, and on motion the proponents, to contradict the witness, were permitted to read the notes to the jury, *held,* no error. (p. 677.)

12. WILLS—FORMER WILL.—EVIDENCE—CAPACITY.

On the trial of such issue a will executed in 1879, about two years before the will in issue, at which former date it is shown the testator was competent, is admissible on the question of his capacity at the time the will in issue was executed. (p. 678.)

13. WILLS—BUSINESS TRANSACTIONS—EVIDENCE—CAPACITY.

Evidence of business transactions by the testator both before and after the execution of the will indicating his mental condition is admissible on the question of his capacity at the time the will was executed. (p. 678.)

14. EVIDENCE—EXPERTS—WITNESSES.

The opinions of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons founded on facts which warrant them; but if the reasons and facts, upon which they are founded, are frivolous, the opinions of such witnesses are worth little or nothing. (p. 678.)

15. WILLS—ATTESTING WITNESSES—EVIDENCE.

The evidence of witnesses who were present at the execution of the will is entitled to peculiar weight, and especially is this the case with attesting witnesses. (pp. 679, 680.)

16. WILLS—CAPACITY—DEED.

It requires less capacity to make a will than it does to make a deed. (pp. 679, 680.)

17. WILLS—OLD AGE—EVIDENCE—CAPACITY.

Old age is not of itself sufficient evidence of incapacity to make a will. (pp. 679, 680.)

18. WILLS—CAPACITY—EXECUTION OF WILL. .

The time to be looked to by the jury in determining the capacity

of a testator to make a will is the time, when the will was executed. (pp. 679, 680.)

19. WILLS—CAPACITY.

It is not necessary that a person should possess the highest qualities of mind in order to make a will, nor that he should have the same strength of mind he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life; it is sufficient if he have mind enough to understand the nature of the business, in which he is engaged, to recollect the property, which he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them. ˙ (pp. 679, 680.)

20. WILLS—CHILDREN—CAPACITY.

In order to make a valid will it is not necessary, that the testator should name all his children in it or give each of them a portion of his estate. If he was mentally capable of understanding the disposition, which he was making of his property, and acted freely, it is immaterial to whom he gives his property,—whether all to one or some of his children, or to strangers. If he has a disposing mind and memory, he has a right to do as he pleases with his property. (pp. 679, 680.)

21. WILLS—CHILDREN.

Although the testator may perhaps have been influenced by feelings of resentment or dislike to one or more of his children, and by feelings of affection and attachment towards others, and though these feelings may have influenced him to give his whole estate to the one part, and little or nothing to the others, this is not sufficient to make the will invalid. (pp. 679, 680.)

22. WILLS—ATTENTIONS TO DEVISEES—UNDUE INFLUENCE.

If the provisions of the will were induced by the extreme kindness and attention to the testator on the part of the principal devisees, that will not constitute undue influence, which will invalidate the will. (p. 680.)

23. INSTRUCTIONS—WEIGHT OF EVIDENCE.

It is improper to single out one witness, although he was the family-physician, and instruct the jury, that his evidence is entitled to great weight. (p. 681.)

24. INSTRUCTIONS.

Where an instruction has already been substantially given, the court is not bound to repeat it. (pp. 681.)

25. INSTRUCTIONS—ASSUMPTION OF FACTS.

Where an instruction refers to a disease by a technical name, is

confused in its parts, and assumes facts as proved, it is properly
refused. (p. 681, 682.)

26. WILLS—CAPACITY—EVIDENCE.

It is not necessary for proponents to prove that the testator
actually recollected all his property, the object of his bounty etc.;
it is sufficient, if he was at the time mentally capable of doing so.
(p. 682.)

27. INSTRUCTIONS—ASSUMPTION OF FACTS.

An instruction was properly refused, which assumed that the
evidence raised in the minds of the jury a doubt of the testator's
capacity. (p. 682, 683.)

28. INSTRUCTIONS—IRRELEVANCY.

An instruction should not be given unless relevant, and it is not
relevant, unless there was evidence tending to prove the facts, on
which the instruction is based. (p. 683, 684.)

29. JURY—DISCRETION—APPEAL.

Submitting to the jury under the statute "particular questions
of fact," is within the discretion of the trial court. This is a re-
viewable discretion. (p. 684 *et seq.*)

30. JURY—SPECIAL FINDINGS.

The question must be of such a character, that the answers
thereto, if contrary to the general verdict, would control the same
and be conclusive of the issue. (p. 685.)

31. JURY—SPECIAL FINDINGS.

Under the statute the court did not err in refusing to submit to
the jury the following questions: "(1) Was the late Lewis Luns-
ford in August, 1880, suffering from a disease known as *senile de-
mentia?* (2) If so, is that disease curable? (3) Had that disease
so far progressed in August, 1882, as to render him (Lewis Luns-
ford) imbecile and incapable of transacting business? (4) Does a
person suffering from such disease have any lucid intervals?"
(p. 685, 686.)

32. WILLS—DECREE—*DEVISAVIT VEL NON.*

When a final decree is pronounced in favor of a will on the ver-
dict of a jury rendered on an issue *devisavit vel non*, the functions
of the suit are exhausted, and the bill should be dismissed. In such
suit the construction of the will cannot be involved. (p. 687.)

33. NEW TRIAL—NEWSPAPER COMMENT.

The court will not set aside a verdict, merely because a newspa-
per during the trial made improper reference to the trial and the
case. (p. 687.)

*R. White, W. W. Arnett* and *F. A. Riddle* for appellant.

*W. P. Hubbard* and *H. M. Russell* for appellees.

JOHNSON, PRESIDENT:

Lewis Lunsford of Ohio county on the 27th day of April, 1881, made his last will and testament, in which he gave to his wife, Ann, during her natural life the house, in which he resided, and the grounds, on which it was situated, and directed his executors to set apart from his estates and invest in such manner, as they might deem best, $10,000.00 and to pay to his wife the dividends, interests and profits accruing therefrom during her life, and gave her during life the household and kitchen furniture and gave her absolutely the provisions on hand at the time of his death, and, if enough was on hand for the purpose, grain sufficient for herself and family for one year. These bequests were in lieu of dower.

By the second clause of his will he directs his executors to divide the residue of his estate, including the portions given to his wife, after the life-estate had terminated, into six shares, one for the children of his deceased daughter, Elizabeth, and one share each for his five living daughters, Sarah L., widow of R. C. Holliday, Margaret M. Lunsford, Julia A. Lunsford, Amanda V., widow of James R. Foster, deceased, Jennie H., wife of William Kerr,—"the six shares to be as nearly as practicable equal to each other, taking into account the respective amounts to be added and charged thereto, as hereinafter specified. I have advanced forty two hundred and sixty two dollars to said Elizabeth in her life time, and eight hundred dollars to her children since her death, on which eight hundred dollars interest is to be computed from February 25, 1881, to the time of my death, and the said forty two hundred and sixty two dollars, eight hundred dollars and the interest aforesaid are to be added to this share, to make it equal to each of the other shares with the proper additions thereto. I have also advanced to the said Sarah L. Holliday twenty five hundred dollars; to Margaret M. Lunsford fifteen hundred dollars; to Julia A. Lunsford fifteen hundred dollars; and to Amanda V. Foster thirty five hundred dollars; and their shares including these advancements as part thereof, are to be made respectively equal. I have also advanced fifteen hundred dollars to Jennie H. Kerr, and her husband is indebted to

me in the sum of thirty nine hundred dollars, upon which interest is to be computed to the time of my death, and this fifteen hundred, thirty nine hundred dollars and the interest aforesaid are to be added to her share to make it equal; but the debt and interest due as aforesaid by the said William Kerr shall be thereby discharged and released." He empowered his executors, for the purpose of making the division, to sell and convey his property. By the third clause he releases his son, Thomas, from any debts he owed him, but declined to make any bequest to him, stating as his reason that he had given to him and paid on his account more than his share in the estate. The testator was about 80 years of age when the will was made. In September, 1884, Jennie H. Kerr brought her suit in chancery to set aside said will. The bill alleges that at the date of said will —the 27th day of April, 1881—and long prior thereto, and continuing down to the date of his death, in 1883, the testator was not of sound mind and disposing memory; that "he was wholly incapacitated by reason of his advanced age, the failure, exhaustion, and weakness of his mental faculties, and the decrepitude of his physical system, to make, execute and acknowledge any valid instrument of writing whatever." It charges, that said will was procured by Amanda V. Foster and other members of the testator's family. The bill alleges, that if said will be permitted to stand, the plaintiff will suffer great wrong and injustice as one of the heirs of the said Lewis Lunsford, and prays that the said will be set aside *etc.* The defendants in their answer deny the charge of incompetency and undue influence. On the 10th day of January, 1885, the court ordered an issue "to be tried at the bar of this court by a jury, to try whether the paper writing dated 27th April, 1881,—a copy of which is exhibited, marked ' A'—is the true last will and testament of Lewis Lunsford." On the May 21st, 1885, the jury was sworn to try the issue and on the 29th day of the same month rendered their verdict : " We, the jury, find that the paper writing dated the 27th April, 1881, * * * is the true last will and testament of Lewis Lunsford." The proponents were given the affirmative of the issue and accorded the right to open and conclude. The contestants moved to set

aside the verdict and grant them a new trial, on the ground that the verdict was contrary to the law and the evidence, because of wrong instructions to the jury, and the admission of improper evidence, and the rejection of proper evidence, and because of a comment made during the trial in the Wheeling Daily Intelligencer, a newspaper published in the city of Wheeling, which last ground was supported by an affidavit. The court overruled the motion and refused to grant a new trial and decreed " that the paper writing dated the 27th day of April, 1881, mentioned in the bill and proceedings in this cause, be and the same is hereby established as and declared to be the last will and testament of Lewis Lunsford, deceased."

The contestants filed a bill of exceptions as to a number of rulings during the trial and to the refusal of the court to set aside the verdict and grant a new trial.

The first exception was, that the affirmative of the issue was given to the proponents and also the right to open and conclude the argument. Upon an issue *devisavit vel non* the proponents of the will have the affirmative of the issue and the right to open and conclude the argument. *Coalter* v. *Bryan*, 1 Grat. 18 ; *McMechen* v. *McMechen*, 17 W. Va. 683 ; *Nicholas* v. *Kershner*, 20 W. Va. 259.

The proponents, to maintain the issue on their part, introduced the will of Lewis Lunsford, deceased, dated the 27th day of April, 1881, also the two subscribing witnesses to the will, B. S. Allison and W. H. Hearne. These two witnesses testified to the execution of the will, and to the mental capacity of the testator, and the proponents then rested.

The contestants then offered many witnesses, who gave evidence tending to show that at the date of the execution of the will the testator was wholly incompetent to make a will. This testimony took a very wide range,—from several years before the execution of the will to several years after and to his death in 1883,—and showed that more than a year after the will was executed on motion and petition of one of the contestants the estate of the testator was put into the hands of a committee.

When the contestants rested, the proponents, against the protests of the contestants made on the ground that the pro-

ponents had rested their case in chief, were permitted to introduce Daniel Lamb, who wrote the will, and a number of other witnesses, who gave their opinions of the sanity of the testator both before, at the time and after the execution of the will, based on the acts, conduct, language and transactions of the testator. It is here insisted that this was error; that after the proponents had rested in chief, they could not introduce any evidence except that which was strictly in rebuttal of the evidence offered by the contestants.

In *Bowyer* v. *Knapp*, 15 W. Va. 295, it was said : " It is alleged as error that the court permitted the depositions of Newman, Kincaid, Flanagan, Richards and Conaway to be read in evidence, because, as is claimed, they were not rebutting evidence. This is an objection to the mere order of the testimony. The bill of exceptions shows that, after the introduction of three witnesses, the defendants ' closed for the present,' and then, after a number of witnesses had been introduced by the plaintiff, principally on the question of the competency of the plaintiff to transact business, the defendants were permitted to introduce the witness Kincaid and others on the same subject. Whether a plaintiff shall be permitted to introduce further evidence after the defendant's evidence is introduced is a matter within the discretion of the court trying the cause; and its exercise will rarely, if ever, be controlled by an appellate court,"—citing, as the only authority, *Brooks* v. *Wilcox*, 11 Gratt. 411.

This principle is sustained elsewhere. *Hoffman* v. *Harrington*, 44 Mich. 183, (6 N. W. Rep. 225) ; *Hess* v. *Wilcox*, 58 Iowa 380, (10 N. W. Rep. 847) ; *Hagerty* v. *White*, 69 Wis. 317, (34 N. W. Rep. 92) ; *Campbell* v. *Moore*, 3 Wis. 673 ; *Harden* v. *Hays*, 14 Pa. St. 91 ; *Smith* v. *Smith*, 8. Ired. 29.

The general rule undoubtedly is, that in the trial of law-issues the party, on whom rests the burden of proof, should introduce in the first instance all his evidence in chief, and then, after the defendant has introduced all his evidence in chief, he should be confined to rebuttal evidence. *Rex* v. *Smith*, 2 Starkie 208; *Rex* v. *Hilditch*, 5 Car. & P. 299; *Hathaway* v. *Hemingway*, 20 Conn. 191; *Clinton* v. *McKenzie*, 5 Strob. 36; *Water Co.* v. *Crary*, 25 Cal. 504; *Kohler*

v. *Wells*, 26 Cal. 606; *Holbrook* v. *McBride*, 4 Gray 215.
This rule should be followed as far as practicable by the
trial-court; but the rule is not an inflexible one, the order
of the evidence being in the discretion of the court,—a dis-
cretion, with which the appellate court will not interfere,
unless it clearly appears, that injustice was done by the
manner, in which the trial court exercised its discretion.

But inasmuch as in issues *devisavit vel non* the burden of
proving the sanity of the testator is on the proponent of the
will; and the issue being " whether the paper writing is the
last will and testament of the testator," and as the will may
be assailed on any and all the grounds, which would show it
invalid, it would not promote justice to apply the rule ap-
plicable to ordinary law-issues.   How are the proponents
to know what kind of testimony, and how much, the contes-
tants have to prove their general charges of want of capacity
and undue influence?   What particular objections and evi-
dence may be offered to sustain such general charges can
only be known as the evidence is developed.   As was said
by White, Judge, in delivering the opinion of the court in
*Runyan* v. *Price*, 15 Ohio St. 6: " To require those affirm-
ing the will either to finally rest their case on the order of
probate, or otherwise, in anticipation of attacks that may or
may not in fact be made, to introduce all the evidence they
may have sustaining the will, on every ground on which it
may be competent for the adverse parties to attack it,—
would not, in our opinion, promote either the convenience
of those charged with the trial, or the justice of the case, but
would tend to contrary results."

In the Ohio case it appeared, that the proponents offered
in evidence the will and probate, which under the statute of
Ohio makes a *prima facie* case for the proponents, and then
rested. After the contestants had introduced their evidence,
the proponents offered general evidence to sustain the will.
To the introduction of such evidence the contestants objected,
but the court overruled the objection and admitted the evi-
dence.   The ruling was affirmed.   The same course was
approved in *Forney* v. *Ferrell*, 4 W. Va. 729.  In the trial of
an issue *devisavit vel non*, it is the proper course to pursue
for the proponents to offer the will and the evidence of its

due execution and the competency of the testator at the time it was executed, and then having made a *prima facie* case to rest; and, after the contestants have offered their evidence against the validity of the will, it is proper to permit the proponents to offer other evidence to sustain the will as well as evidence in rebuttal of the evidence of the contestants. The court did not err in overruling the objection to the evidence offered by the proponents.

Did the court err in admitting or rejecting evidence? The witness McFarland was asked the question : "At the time of your visit at the house and of Mr. Lunsford's and lady's visit to your place of business was there any one who influenced him to any extent?" Objection was made by proponents and sustained by the court. This ruling was clearly right. The witness had no right to tell the jury that influence was exerted on the testator. He could tell what he saw, and the jury would be left to infer, whether any influence had been exerted, and whether it was undue influence,— one of the questions in issue.

Thomas Lunsford, one of the children and heirs of the testator, was asked his opinion of the mental condition of the testator. The court properly refused to permit the question to be answered, as under our statute he was incompetent to speak on the subject. *Anderson* v. *Cranmer*, 11 W. Va. 562.

Did the court err in refusing to allow the medical experts to answer the hypothetical questions propounded? Several were allowed to be answered, against the objection of the proponents, and to the ruling of the court they excepted. The following question was asked Dr. James E. Reeves :

"Doctor, assuming that a person seventy seven years of age in the month of August, 1880, was sick for a period of two or three weeks, and that during such sickness it was found, that such person believed himself to be in a location different from that in which he was, and whose mind, in the month of August, 1882, was impaired almost to its fullest extent, what would be your diagnosis, as an expert, of such person's malady or condition, and what would be your opinion, as an expert, of his mental capacity on April 27, 1881 ?"

The doctor answered : "Evidently the illness or sickness

in 1880, at which time there was delusion, as shown by his belief that he was elsewhere than at the place where he was then resting, and that in 1882 there was complete destruction of the mind, the clear inference would be that the sickness in 1880 may very reasonably be related, as cause, to the effects which were so plainly apparent in 1882; and while there is evidently a gap in the question, which would not enable an expert to arrive at an exact conclusion, or aid him in creating the case in his own mind, there is nothing that would substitute the opinion that the patient was the subject of senile *dementia*. Now, in further answer to the question when the fact of senile *dementia* is found to exist, that means nothing more or less than mental incapacity, not in the performance of any one, but of all, acts. In a word, when that disease is developed,—and when I say developed I mean that its progression has gone so far as to be recognized by friends and associates,—I might just as reasonably say that a man could run without two legs as to say that a man suffering from senile *dementia* is capable of the transaction of business."

Dr. Reeves was also asked : " Suppose a man of the age of seventy seven, in the month of August, 1880, and who, during the month of May, 1880, had lost a favorite son by death, and who, in the years 1875 and 1876, had been a capable and active man, and whose memory in the month of June, 1880, was discovered to be considerably impaired, and who was in the habit of relating past events to the same person, day after day, without seeming to know he had related them at all, and who, in the month of August, was sick with an illness of two or three weeks' duration, and who, in that month, was found to have believed himself to be in a locality different from that in which he was, and who, in the month of January, 1880, had sold a piece of valuable real estate at a price which Col. Thomas O' Brien considered, to say the least, was very cheap, and who, in August, 1882, was found to have suffered a mental deterioration almost to its fullest extent,— what would be your diagnosis of such a case, and what would be your opinion of the mental capacity of such a person on the 27th day of April, 1881 ?"

The doctor answered : " That question fills the gap I men-

tioned when I was on the floor before. It completes the description which leads me irresistibly to the conclusion that the case was one of senile *dementia*, and I have only to repeat what I said before,—that, when the fact is established to me, it would be just as absurd to think of a man running with one leg as to say he was capable of transacting business."

*Question.* "Well, with reference to the capacity of such a person on the 27th of April, 1881, what would you say, doctor?"

The answer was: "Remembering the rise and termination of the case as presented in the question, there could be no other reasonable conclusion than at that date he was incapable," *etc.*

The following question was asked of the same witness, against the objection of the proponents, and answered : "Doctor, suppose that an active and capable man in the years 1875 and 1876, who, in the month of May, 1880, was of the age of seventy seven or thereabouts, and who in that month sustained the loss of a favorite and dutiful son, and who was found in the month of June, 1880, to have sustained a considerable impairment of memory, and who, in that month, was in the habit of relating events and circumstances connected with the past, and of repeating the same things to the same person, without recollecting that he had before stated them, and who, in the month of August, 1880, had suffered from an illness of two or three weeks' duration, and who, during such illness, had conceived himself to be in a locality different from that in which he was, and who, in the month of January, 1881, had disposed of valuable real estate, at a price which, in the opinion of Col. Thomas O'Brien, was very cheap, to say the least, and who, in the month of August, 1882, was found to have suffered an impairment of mind almost to its fullest extent,—what would you say of the capability of such a person, under such circumstances, of comprehending the nature and extent of his estate, whether large or small, the subjects of his bounty, and the manner in which his estate should be divided among them, on the 27th day of April, 1881 ?"

*Answer.* "That question, I take it, is substantially the question I answered before, and I repeat that, the diagnosis.

having been made, it was a case of senile *dementia ;* that there can be no judgment without memory, and that both these qualities of mind are necessary in order to transact business with a will-power. I unhesitatingly say that such a subject would be incapable, at the period named, of transacting business with judgment and justice."

In *McMechen* v. *McMechen*, 17 W. Va. 683, it was held, that, when a medical expert is asked to give his professional opinion to a jury not upon matters within his own knowledge but upon a hypothetical case founded upon the testimony of witnesses previously examined in the case, the questions to him must be so shaped as to give him no occasion to mentally draw his conclusions from the whole evidence or a part thereof, and from these conclusions so drawn express his opinion, or to decide as to the weight of evidence or the credibility of witnesses; and his answers must be such as not to involve any such conclusion so drawn, or any opinion of the expert as to the weight of the evidence or the credibility of the witnesses. The opinion of medical experts founded on testimony already in the case can be given only on a hypothetical case, and the hypothesis must be clearly stated, so that the jury may know with certainty upon precisely what state of assumed facts the expert bases his opinion.

In addition to the principles announced in that case it is now held, that in putting hypothetical questions to expert witnesses counsel may assume the facts in accordance with his theory of them. It is not essential, that he state the facts as they exist, but the hypothesis should be based on a state of facts, which the evidence in the cause tends to prove. *Cowley* v. *People*, 83 N Y. 464. In that case Folger, C. J., in delivering the opinion of the court, said:

" The claim is that a hypothetical question may not be put to an expert, unless it states the facts as they exist. It is manifest, if this is the rule, that in a trial where there is a dispute as to the facts, which can be settled only by the jury, there would be no room for a hypothetical question. The very meaning of the word is that it supposes—assumes—something for the time being. Each side, in an issue of fact, has its theory of what is the true state of facts, and assumes

that it can prove it to be so to the satisfaction of the jury, and, so assuming, shapes hypothetical questions to experts accordingly; and such is the correct practice. *Erickson* v. *Smith*, 2 Abb. Dec. 64; *People* v. *Lake*, 12 N Y. 358; *Seymour* v. *Fellows*, 77 N Y. 178; *Guiterman* v. *Steam-Ship Co.*, 83 N. Y. 358."

The first of the questions put to Dr. Reeves, which the court permitted to be answered, is unobjectionable under the rules above laid down. But both the others are objectionable and improper, because they leave the witness to weigh the credibility of Col. Thomas O' Brien. The two questions put Dr. Smith are open to the same objection. The first question put to Dr. Reeves, which the court permitted to be answered, is not as full and complete as some which were refused. Nearly all the questions put to Dr. Reeves are open to the same objection in one form or the other.

The two following hypothetical questions were put to Dr. Reeves: " Assuming that a man seventy seven years of age, in the month of August, 1880, who had, in the month of May, 1880, suffered the loss of a faithful and dutiful son, and who was found in the month of August to be suffering from an illness of two or three weeks' duration, and who, during such illness in the month of August, 1880, was found to be under delusion, especially as to locality, was found to be afflicted with a mental disorder,—although slightly, yet certainly and unmistakably, affecting his mind,—and who, in the month of August, 1882, was pronounced to have suffered an almost complete loss of mental power, and who, at that time, was incapable of transacting business affairs,—what would be your diagnosis of such a person, as an expert, and what would be your opinion of his mental capacity on the 27th day of April, 1881 ?"—" Doctor, assuming the case of a man seventy seven years of age in February, 1880, and who was found in the month of August, 1880, to be sick and under the care of his family physician, and, during the sickness occurring in August of that year, the patient supposed himself to be in a place distant from where he actually was, and who was found, during that sickness, to be afflicted with a mental disorder, although slightly, and who was found in the month of August, 1882, to have sustained an almost total loss of mental

85

power,—what would be your diagnosis of such a person's condition, as an expert, and what would be your opinion, as an expert, of his mental capacity on the 27th day of April, 1881 ?"

These questions are proper under the rules we have laid down, and ought to have been answered; but as questions were permitted to be answered which were, at the least, as favorable to the contestants as these, although they were not proper questions, as we have seen, yet, as they were answered, and the contestants had the benefit of them, they were not prejudiced because the foregoing questions were not answered. Dr. Reeves was so positive in his answer to the hypothetical questions put to him, and his answer covering the whole ground, it is impossible that the jury was confused or misled by the refusal to permit the two proper questions to be answered.

It was claimed by contestants that one evidence of the incompetency of the testator was the fact, that he sold the Market-Street house at a very low price,—much lower than a business man in possession of all his faculties would have sold it for; and the contestants asked Dr. Caddel, who was lessee of the property, and who testified he knew the value of it: "What was the value of that property?" Proponents objected, the objection was sustained, and the contestants excepted. Mr. Rinehart had testified that he had purchased the property from the testator at $10,000.00, and that the price paid was, he thought, full value for it. The witness was then asked, "Did you ever offer Mr. Rinehart a sum of money for that property?" which question was objected to, and objection sustained. Then the witness was asked, "Did you ever offer him $14,000.00 for it?" Objected to, objection sustained, and contestants excepted. Then Rinehart was recalled for further cross-examination, and said he had an offer for the property from Mr. Zook, a member of Dr. Caddel's firm. The offer was $10,000.00. It was not $14,000.00. Did not tell him he would not sell for $14,000.00, and that it was worth $18,000.00. The question was then asked Dr. Caddel, what Rinehart stated the property was worth.

I do not think the court erred in refusing to permit the

witness to state what Rinehart said the property was worth; but I can not see upon what principle in the law of evidence Caddel could not, as well as any other witness, state what the property was worth. It was shown that in January, 1881, the testator sold this property, some three months before the will was executed. It was contended by the contestants, that it was sold at a very low price, and that this was an evidence of the incapacity of the testator at the time to transact business. Rinehart for proponents had testified, that he thought the price he paid was its full value; if so, then the transaction would afford no evidence of weak intellect on the part of the testator. The evidence of Caddel, offered to prove the value of the said property, was competent and relevant testimony, and the court erred in refusing to admit it. But is this error sufficient to reverse the decree, and to set aside the verdict of the jury?

This Court said in *State* v. *Kinney*, 26 W. Va. 143, that, " to authorize the reversal of a judgment for admitting irrelevant evidence, not only must the evidence be irrelevant, but it must be of such a nature that its admission may have prejudiced the prisoner. If he may have been so prejudiced, even though it be doubtful whether in fact he was so, that is sufficient ground for reversing the judgment. *Insurance Co.* v. *Trear*, 29 Grat. 255; *Payne* v. *Com.*, 31 Grat. 855." The converse of this proposition is equally true,— that, to authorize the reversal of a judgment for refusing to admit relevant testimony, not only must the evidence be relevant, but it must be of such a nature that its rejection may have prejudiced the party offering it. If he may have been so prejudiced, even though it be doubtful whether in fact he was, that is sufficient ground for reversing the judgment.

We cannot here say that the rejection of this evidence could not have prejudiced the contestants. We do not know how close a case it was in the minds of the jury. It might have been so nicely balanced that it would have taken very little to have turned the scale. This looks like a small matter on which to reverse the decree in a cause of the magnitude of this; but to lay down proper, correct and uniform rules for the guidance of the courts is of much more import-

ance than the speedy termination of the suit, or saving costs to the parties. It is strange in such a record involving such a variety of rulings, that it should have to be reversed on such a ruling; but it can not be helped, and for this error alone the decree will have to be reversed, the verdict set aside, and a new trial granted. This is my opinion, but my brothers do not think that this error, if one, is sufficient to reverse the decree, because it was on a collateral fact, on which there was already sufficient evidence to prevent the jury from being misled, because the testimony was refused.

The contestants offered in evidence an order made by the Circuit Court of Ohio county on the 4th day of October, 1882, adjudicating the said Lewis Lunsford to be insane and appointing a committee for him, with the petition and notice for said appointment; but the court refused to admit any of the papers except the notice and so much of the order as adjudicated, that said Lunsford was insane and appointed a committee for him. The contestants excepted.

There appears to be no petition for such appointment in the record other than the notice signed by Amanda V. Foster by her attorney. There is a petition of the "committee" filed, which asked the court to instruct him as to his duties under said appointment. This of course was irrelevant and not proper evidence. The only reason for complaint is, that the court refused to permit the whole of the order to go in evidence. The remaining part of said order relates to the duties of the "committee" with reference to the estate of the said Lunsford, called forth by the said petition of the committee and in answer thereto. At this time the contestants did not ask, that the whole record of the inquisition should go to the jury. Some time before that the contestants identified an affidavit made by W. J. Bates, Jr., and also what purported to be a committee-bond reciting, that Amanda V. Foster had been appointed committee for Lewis Lunsford by the clerk of the County Court of Ohio county, —to which objection was made and sustained, and contestants excepted. They offered then no order adjudicating the party insane, and of course the court did not err in refusing to permit the said papers to go in evidence. What was properly the record of the inquisition *de lunatico inquirendo*

was proper evidence. *Rogers* v. *Walker*, 6 Pa. St. 371; *Hutchinson* v. *Sandt*, 4 Rawle 234; *Rippy* v. *Gant*, 4 Ired. Eq. 443; *Yauger* v. *Skinner*, 14 N. J. Eq. 389; *Redden* v. *Baker*, 86 Ind. 191; *Wheeler* v. *State*, 34 Ohio St. 394; *Field* v. *Lucas*, 21 Ga. 447; *Hart* v. *Deamer*, 6 Wend. 497; *Willis* v. *Willis*, 12 Pa. St. 159. The last part of the order relating to the duties of the " committee " is properly no part of the inquisition, and the court did not err in refusing to permit it to be read in evidence.

It is insisted, that the court erred in permitting the stenographer's notes to be read to the jury. Alfred Caldwell was called as a witness for contestants, and said he was counsel in the case of *Goshorn* v. *Carter*, tried at the April term, 1881, of the Circuit Court of Ohio county. He testified, that the testator was sworn as a witness in that trial; that, when he was on the stand, on some subjects he was pretty clear, but in some respects was incoherent. " He was an old man, and his testimony did not agree very well with his previous conversation with me, which made me have him summoned as a witness. He would wander off in answering some of the questions."

On cross-examination, witness said: " I have the stenographer's report of the testimony in that case and will produce it. In this testimony Mr. Lunsford appears, and it shows he was called for the plaintiff and examined by myself. This is a report of all his testimony given on that trial, and is substantially accurate. Captain Mathews, who made this report, was the official stenographer of the court, but not sworn as such, I learn."

Thereupon, counsel for proponents offered to read said testimony of Lewis Lunsford to the jury, to which contestants objected, and the objection was overruled, the testimony read, and contestants excepted. This, certainly, would not be proper evidence in chief. *Misner* v. *Darling*, 44 Mich. 438, (7 N. W. Rep. 77); *People* v. *Sligh*, 48 Mich. 54, (11 N. W. Rep. 782); *Lipscomb* v. *Lyon*, 19 Neb. 511, (27 N. W. Rep. 731). The notes are not of that character properly authenticated to make them admissible as substantive independent testimony. But they were offered to contradict the evidence of Caldwell, who had sworn, that they were sub-

stantially correct. Caldwell had characterized the evidence as wandering and incoherent, and as evidence tending to contradict him they were admissible.

It is also alleged as error, that the court admitted to be read in evidence a will, which the testator had executed in 1879. It is not questioned in the case, that the testator was fully competent to execute a will in 1879. This will was clearly admissible on the question of capacity to execute the will in question, because it is similar in its provisions and tends to show a steady and fixed purpose as to the manner, in which the testator intended to dispose of his property. The same may be said of another draft of a will, not executed, which was proved to have been dictated by the testator.

It was also objected that certain questions were asked of the committee as to the dates, at which the testator acquired a certificate of deposit and certain stock, which questions were answered by the witness after looking at the indorsements on the papers themselves. The testimony on the question of capacity was admissible, as tending to show business transactions, at the respective dates, by the testator.

In January, 1882, the testator had bought a suit of clothes of R. L. Prall; the cutter took his measure and had certain conversations with him; he acted as other customers; left strict orders about how he wanted the pockets made. Witness was asked the question: "From what took place at the time the clothes were ordered, the conversation you had with Mr. Lunsford, and what took place at the time, what is your opinion as to his mental condition then?" Objections by contestants overruled, and exception. The witness answered: "I didn't see anything the matter with the gentleman at all, whatever, in any way." The rule in our State is: "The opinion of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons, founded on facts which warrant them; but if the reasons and facts, upon which they are founded, are frivolous, the opinions of such witnesses are worth but little or nothing." The evidence is admissible, and it is for the court or jury, under the circumstances, to give the opinions such weight as they think they should receive. For the same reason the

court did not err in admitting the testimony of Joseph F. Paull. A number of other exceptions were saved as to rulings on the admission or rejection of evidence, but we have noticed all argued by the learned counsel in their elaborate brief, and have examined the record closely, and we think no errors in this regard were committed in said rulings.

It is insisted that the court erroneously instructed the jury for the proponents. The instructions so given at the instance of proponents were as follows:

" (1) The evidence of witnesses who were present at the execution of the will is entitled to peculiar weight, and especially is this the case with attesting witnesses.

" (2) It requires less capacity to make a will than it does to make a deed.

" (3) Old age is not of itself sufficient evidence of incapacity to make a will.

" (4) The time to be looked to by the jury, in determining the competency of the testator to make a will, is the time when the will was executed.

" (5) It is not necessary that a person should possess the highest qualities of mind in order to make a will, nor that he should have the same strength of mind which he may formerly have had. The mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life ; but it is sufficient if he understand the nature of the business in which he is engaged, has a recollection of the property which he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them.

" (6) In order to make a valid will, it is not necessary that the testator should name all his children in it, or give all of them a portion of his estate. If he was mentally capable of understanding the disposition which he was making of his property, and acted freely, it is immaterial to whom he gives his property,—whether all to one, or some, of his children, or to strangers. If he has a disposing mind and memory, he has a right to do as he pleases with his property.

" (7) Although the testator may, perhaps, have been influ-

enced by feelings of resentment or dislike to one or more of his children, and by feelings of affection and attachment towards others, and though those feelings may have influenced him to give his whole estate to the one part, and little or nothing to the others, this is not sufficient to make the will invalid.

" (8) If the provisions of the will were induced by the extreme kindness and attention to the testator on the part of the principal devisees, that will not constitute undue influence which will invalidate the will."

These instructions propounded the law correctly, and have been expressly approved by this Court in *Jarrett* v. *Jarrett*, 11 W. Va. 584, and *Nicholas* v. *Kershner*, 20 W. Va. 251, except the fifth one, which, to be accurate, instead of using the language, "if he understand the nature of the business in which he is engaged," *etc.*, should read, " it is sufficient if he possess mind enough to understand," *etc.* It would be hard to prove that a testator, of whose competency there was no question, recollected all his property, *etc.;* that is, made no mistake.

The court at the instance of the contestants gave the following instructions, to which there were no objections by the proponents :

" The opinions of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons, founded on facts which warrant the opinion that the testator was capable of understanding the nature of his business in which he was engaged when he made his will, recollected his property he meant to dispose of thereby, as well as the objects of his bounty, and the manner in which it is to be distributed among them.

" That before the jury can find a verdict in favor of the proponents, they must believe from the evidence that Lewis Lunsford, on the 27th day of April, 1881, had the active power of mind and memory sufficient to collect and retain the elements of the business in which he was engaged, when making his said will, for a sufficient time to perceive their obvious relations to each other.

" That unless the jury believe from the evidence that the testator acted freely and of his own will, and understood the

nature of the business in which he was engaged in making his will, and had a recollection of his property thereby disposed of, as well, too, of the objects of his bounty, and understood the manner of the distribution of his property by the will, they must find a verdict in favor of the contestants.

" The court instructs the jury that the evidence of physicians, especially those who attended the testator and were with him during the time it is charged he was of unsound mind, is entitled to great weight.

" The court instructs the jury that the condition of the testator's mind, both before and after the execution of the purported will, is proper to be considered in determining what was his mental condition at the time the purported will was executed."

The following instructions were asked by contestants, objected to and refused, and contestants excepted. We will dispose of them *seriatim :*

" The court instructs the jury that, in considering the testimony, the evidence of Dr. W. J. Bates, Jr., the physician who attended the testator and was his family physician, is entitled to great weight." . This instruction was properly refused. It was in effect asking the court to tell the jury, that Dr. Bates' evidence was entitled to great weight. The court had already at the instance of the contestants instructed the jury correctly,—and it was as far in that line as it was proper to go,—" that the evidence of physicians, especially those who attended the testator and were with him during the time it is charged he was of unsound mind, is entitled to great weight."

The second refused instruction had before been substantially given. The fourth asked the court to instruct the jury, " that it is proper to consider the condition of the mind and memory of the testator both before and after the date of the will in question in determining the question of the testator's capacity to make said will. This instruction had already been substantially given, and the court is not bound to repeat its instruction.

The next refused instruction was: " The court instructs the jury, that the opinion of witnesses not experts are entitled to little or no regard, if the facts, on which such opin-

ions are professed to be founded, do not warrant the opinion, that an old man, in whom the disease of *senile dementia* was developed several months before the date of the will, to the degree that his family physician noticed it, was at the date of said will not so afflicted by said disease as that he was able to understand the nature of the business, in which he was engaged in making his will, to recollect his property and the subjects of his bounty and the manner of its distribution by the will among such subjects."

The instruction was properly refused, because of at least three fatal objections: *First*, it is confused; *second*, it refers to a disease by a technical name that the jury is not supposed to understand; and, *third*, it assumes a number of facts to have been proved to the jury.

The next instruction is: "The court instructs the jury, that the law presumes that the testator, Lewis Lunsford, was not capable of making a will, and the burden is on the proponents to show, by competent testimony, that, at the date of his will, the said Lewis Lunsford understood the nature of the business in which he was engaged, recollected his property disposed of thereby, the objects of his bounty, the number of them, the advancements he claims thereby to have made to them, and the manner in which he wished to distribute his property."

This instruction, in the terms in which it was asked, was properly refused, because it would be sufficient "if he possessed mind enough to understand " *etc.* It is not necessary for the proponents to prove that a testator actually understood and recollected all these things; if he was mentally capable of doing so, it is sufficient.

The next instruction is: "The court instructs the jury that if they believe, from the evidence, that the said Lewis Lunsford was affected with a mental disorder known as ' *senile dementia*,' during the month of August, 1880, then they should consider the nature, progress, effect, and termination of such disorder,—as shown by the testimony,—as bearing upon the mental capacity of Lewis Lunsford on the 27th of April, 1881, to make, execute, and acknowledge the alleged will as his free and voluntary act."

This instruction was properly refused, because it proposes

to place the jury in the place of medical experts to trace the progress of a disease of which they are supposed to know nothing, and because the instruction assumes that the testimony " shows the nature, progress, effect, and termination of senile *dementia.*"

The court was also asked to instruct the jury " that, whilst it may be true that an enfeebled old man, whose mind has to some degree become debilitated and memory enfeebled and understanding weakened, may sometimes have sufficient capacity to make a will, yet, if the jury believes, from the evidence in this case, that the testator was, several months previous to the date of his will, afflicted with a disease which then materially affected his mind and memory, and which progressed in its effects upon the mind to the date of the will, and continued to progress for sixteen months afterwards, when, because thereof, the testator was mentally unable to transact business, then they should weigh the testimony tending to show mental capacity with great care, and be satisfied that it was sufficient to overcome the doubts of the testator's capacity, existing both by reason of said disease, as well as by reason of the presumption of incapacity which the law fixes."

The court properly refused to give this instruction. It must always be remembered that the time to be looked to for the testator's capacity is the time when the will was executed. The evidence might be so clear, to the minds of the jury, that at that time the testator was competent, as to leave no doubt whatever in their minds, even though they might believe from the evidence that previous to the execution of the will the testator was afflicted with a disease which materially affected his mind and memory, and which progressed in its effects upon his mind to the date of the will, and for sixteen months afterwards, when, because of said disease, the testator was mentally incapacitated to transact business; yet the instruction assumes that this evidence raised a doubt in the minds of the jury that he was competent when the will was executed.

The court was also asked to instruct the jury " that they must take into consideration all the evidence tending to show that the said Lewis Lunsford was induced to make the

alleged will in controversy by the direction, suggestion, or persuasion of any other person or persons; and if the jury believe, from the evidence, that any undue influence was used to induce the said Lewis Lunsford to make the will in question, they will take into consideration the person or persons exercising such undue influence, if they believe, from the evidence, that any such was exercised, together with the relation of the person or persons alleged to have exercised any undue influence."

This instruction was properly refused. To authorize an instruction it must be relevant. There must be some evi-dence tending to prove the facts upon which the instruction is based. Here is no evidence tending to prove undue or other influence exerted by any one on the testator to induce him to make the will in question.

The last instruction asked by contestants and refused singles out the family-physician and asked that the jury be instructed, that his evidence is entitled to great weight. For reasons already stated, the instruction was properly re-fused. We have thus gone over every instruction asked, given and refused, and it is quite evident some would have been proper with slight modification; but the court was not bound to modify them.

It was assigned as error, that the court declined to submit the following questions to the jury, to be answered by it: "(1) Was the late Lewis Lunsford, in August, 1880, suffer-ing from a disease known as ' senile *dementia?* ' (2) If so, is that disease curable? (3) Had the disease so far pro-gressed in August, 1882, as to render him (Lewis Lunsford) imbecile, and incapable of transacting business? (4) Does a person suffering from such disease have any lucid inter-vals?"

Section 5 of chapter 131 of the Code provides that, " upon the trial of any issue or issues to a jury, whether under this section or not, the court may on motion of any party direct the jury in addition to rendering a general verdict to render separate verdicts upon any one or more of the issues, or to find in writing upon particular questions of fact, to be stated in writing. The action of the court upon such motion shall be subject to review as in other cases. Where any such

separate verdict or special finding shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly."

This is the first time the Court has been called upon to construe this statute. A number of western States have similar statutes which have received construction. None of them are precisely like ours. *Railroad Co.* v. *Campbell*, 16 Kan. 200; *Dubois* v. *Campau*, 28 Mich. 304; *Railroad Co.* v. *Goddard*, 25 Ind. 185; *Tobacco Co.* v. *Jenison*, 48 Mich. 459, (12 N. W. Rep. 655); *Dickerson* v. *Dickerson*, 50 Mich. 37, (14 N. W. Rep. 691); *Eberhardt* v. *Sanger*, 51 Wis. 72, (8 N. W. Rep. 111).

In *Dubois* v. *Campau*, 28 Mich. 304, Campbell, J., speaking for the court, said: "The questions to be separately submitted to the jury are required to be 'particular questions of fact,' (2 Comp. Laws, § 6026,) and these, as we have held should be such as to involve legal consequence. *Crane* v. *Reeder*, 25 Mich. 303. We think such a question as that which was put here could not be fairly called a particular question of fact, and it is difficult to imagine any answer that could have any controlling force in reaching a conclusion." The action was ejectment, and the question the court declined to put to the jury was: "By what acts did Joseph Campau claim to hold possession adversly to the plaintiffs?"

In *Tobacco Co.* v. *Jenison*, Cooley, J., for the court, said: "All the questions which remain unanswered might also have been excluded, for none of them were conclusive." We have no doubt the submitting to the jury, under the statute, of "particular questions of fact" is within the discretion of the trial court, which discretion is reviewable.

The questions must be of such a character that the answers thereto, if contrary to the general verdict, would control the same, and be conclusive of the issue. That this is true is apparent from the language of the statute. It declares: Where any such * * * special finding shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly." Now let us see, what according to these principles would have been the effect, had there been a general verdict in favor of the will, and had the jury at the same time answered the first question: " Was

the late Lewis Lunsford in August, 1880, suffering from a disease known as senile *dementia?*"—"Yes;" and to the second question: "Is that disease curable?"—"No;" and to the third: "Had the disease so far progressed, in August, 1882, as to render him (Lewis Lunsford) imbecile and incapable of transacting business?"—"Yes;" and to the fourth question: "Does a person suffering from such disease have any lucid intervals?"—"No." If these questions had been submitted, and the answers found as indicated, could such special findings have controlled the general verdict in favor of the will, and have required the court, on the special findings, to enter a decree against the will?

It is very clear what was the object of the contestants' counsel in asking these questions to be submitted. Their theory is, that if the testator in August, 1880, had senile *dementia*, and that disease was incurable, and it had so far progressed, that in two years thereafter the testator was imbecile and incapable of transacting any business, and that a person suffering from such disease has no lucid intervals, then it must inevitably follow, that on the 27th day of April, 1881,—the date of the will,—the testator was incompetent to make it. The main issues were: Was Lewis Lunsford, the testator, at the date of the will mentally competent to make it; and did he act freely?

It will not do to say, that because an old man is suffering from senile *dementia*, from August, 1880, until August, 1882, at which time he was incompetent, that therefore, twenty months before the latter date, on the 27th of April, 1881, he was as a legal consequence incompetent to make a will, even though the disease be incurable, and there are no lucid intervals. The question still is: What was his mental condition, at the time the will was made? At that time did he have mind sufficient to authorize him to execute a valid will? Dr. Edwards in his deposition in behalf of the contestants says: "All old men, who begin to go down hill, begin to have senile *dementia* to a limited extent. Of course some retain their intellect longer than others." It would be sad, indeed, if all old men suffering from the disease of senile *dementia* were because of this fact to have their wills set aside, —their wishes disregarded,—even though a jury might think

them competent testators. It was not proper to submit the questions, or either of them; and the court did not err in refusing to submit them.

The court did not err in refusing to set aside the verdict and grant a new trial, on the ground that the verdict was contrary to the law and the evidence, or because of misdirection by the court. The evidence was conflicting, and on well-established principles the verdict could not be set aside as against evidence. The motion for a new trial was also based upon an affidavit, that the Wheeling Intelligencer, a daily newspaper published in the city of Wheeling, had the following paragraph published therein during the trial: "The Lunsford will case still drags its slow length along. It will probably occupy the entire remainder of this week. The general public opinion is that the jury will sustain the will, or disagree. Among the witnesses examined yesterday were Rev. Dr. Cunningham, Attorney General Caldwell, Hon. Daniel Lamb, and John O. Pendleton." "And affiant further says, that said daily newspaper has a large circulation in and through said city, and is very generally read by the people of said city, as he believes."

Here is no evidence that any member of the jury read said paragraph, and, if they had, that would not be sufficient to set aside the verdict. If the fact was as therein stated as to the "public opinion" on the case, the members of the jury, who were not required to be, and were not, kept together, could have heard the matter talked of without themselves being culpable. If verdicts could be set aside on such grounds, suits would be interminable. The court did not err in refusing to set aside the verdict on this ground.

It is insisted, that the court erred in not giving a construction of said will, as such construction was asked in the bill. This matter in the bill may be regarded as mere surplusage, as it could not be joined in a bill for an issue *devisavit vel non*. When a final decree is pronounced in favor of a will on the verdict of a jury rendered on an issue *devisavit vel non*, the functions of the suit are exhausted, and the bill should be dismissed. In such suit the construction of the will cannot be involved. *Coalter's Ex'r* v. *Bryan*, 1 Gratt.

18; *Dower* v. *Church*, 21 W. Va. 23; *Couch* v. *Eastham*, 27 W. Va. 796. The decree is affirmed.

AFFIRMED.