# CHARLESTON.

### GILLINGHAM v. OHIO RIVER RAILROAD CO.

Submitted June 17, 1891.—Decided December 12, 1891.

1. RAILROAD COMPANIES—PASSENGERS.

A common carrier of passengers is one who undertakes for hire to carry all persons indifferently who may apply for passage, so long as there is room and there is no legal excuse for refusing.

2. RAILROAD COMPANIES—PASSENGERS.

Every one riding in a railroad car is presumed *prima facie* to be there lawfully as a passenger, having paid or being liable when called on to pay his fare.

3. RAILROAD COMPANIES—PASSENGERS—CONDUCTOR.

It is the duty of the carrier to treat the passenger properly and carry him safely—to protect the passenger against any injury from the negligence or willful misconduct of its servants while performing the contract, and of his fellow passengers and strangers, so far as practicable.

4. RAILROAD COMPANIES—PASSENGERS.

The common carrier of passengers is not an insurer of their safety, or of their proper treatment, but is liable for their injury or improper treatment due to the negligence or willful misconduct of its servants while engaged in executing the contract.

5. RAILROAD COMPANIES—PASSENGERS—FALSE IMPRISONMENT.

The common carrier of passengers is liable for the false imprisonment of a passenger, made or caused to be made by its conductor in charge of the train during his execution of the carrier's contract to treat properly and convey safely.

6. RAILROAD COMPANIES—PASSENGERS—CONDUCTOR.

Section 31, chapter 146 of the Code, which enacts among other things that "the conductor of every train of railroad cars shall have all the powers of a conservator of the peace, while in charge of the train," does not relieve the carrier of passengers from such liability.

7. RAILROAD COMPANIES—PASSENGERS—FALSE IMPRISONMENT.

A case of false imprisonment of a passenger by the conductor, in which these principles are applied.

*Z. T. Vinson* for appellant cited Thomp. Trials § 2685; Ell. Adv. 659; Beach R'y § 889; 11 S. E. Rep. 767; Ror. R'ds 842, 1192; 26 Ind. 70, 72; 19 Ohio St. 110; 64 N. Y.

136; 69 N. Y. 170; 36 N. Y. § 222; 91 Pa. St. 256; 37 Mich. 205; 60 Mo. 413; 6 Q. B. L. R. 318; 4 Daly 338; 66 Mo. 572; 57 Vt. 135; 45 Conn. 44; 139 Mass. 556; 9 Ill. App. 632, 639; 39 N. Y. 381; 36 Hun. 643; Mech. Agency §§ 732, 734, 735, 737, 740; 7 Am. Rep. 418; 60 Am. Dec. 765; Ror. R'ds 842.

*Gibson & Michie* for appellee, cited 29 Am. & Eng. R'd Cas. 320; 28 Id. 455; Id. 288; 34 Id. 4621; Id. 378; 33 Id. 407; 9 Id. 264; Id. 412; 30 L. P. Rep. Q. B. 148; 5 L. R. A. 442; 12 Am. & Eng. R'd Cas. 127; 8 Id. 354; 13 Id. 1; 44 Id. 384; Harris *v.* Louisville &c. R'd Co. 35 Fed. Rep.; 42 Hun 587; 136 Mass. 552; Cool. Torts 685.

HOLT, JUDGE:

This was an action of trespass on the case brought on the 15th day of October, 1889, in the Circuit Court of Cabell county by Elmer Gillingham against the Ohio River R. R. Co., averring in substance that at the station in the town of Huntington, he was on defendant's passenger train with the proper ticket for Ben Lomond, a station on defendant's line, and that defendant through its agent the conductor, unlawfully, falsely, maliciously and without reasonably probable cause, caused plaintiff to be arrested handcuffed, and led and driven in the daytime through the principal street of Huntington, a long distance, to the office of a justice, on an unfounded charge, before whom he was tried on the merits, found innocent and discharged; all of which was done by defendant, to plaintiff's great mental anguish, humiliation and distress, loss of time, inconvenience and expense, to his damage, *etc.* Defendant appeared and demurred to the amended declaration, and the court overruled the demurrer, and thereupon defendant pleaded not guilty. The cause was tried by a jury, who brought in a verdict for one thousand dollars damages; defendant moved the court to set the same aside and award a new trial and made various other motions, all which the court overruled and rendered judgment; and defendant brings the case here on writ of error.

On behalf of plaintiff four witnesses were examined,

himself, the officer who made the arrest and W. A. Thornley and William Bell, who were present at the arrest and during the transactions which led to it. On behalf of defendant one witness was examined, viz.: the conductor of the passenger train who caused the arrest to be made.

The record sets out in full the evidence, not the facts proved; as to a large part of it, however, there is no substantial conflict, so that it can be safely said for the present purpose, that the facts are as follows:

The plaintiff, twenty four years old, was a farmer living in Ohio, nine miles from Gallipolis, but for a short time preceding 17th September, 1889, had been working for Thornley at a saw-mill in Cabell county, W. Va. On that day he came into Huntington and bought a railway ticket from defendant for Greenbottom depot. He had an uncle living in Huntington, and before starting received a letter from home stating that his mother was sick; thereupon he decided to go on up to Ben Lomond station, and bought from defendant a ticket for *that* place. He then went back to the depot, some forty minutes before the schedule time for his train to start, Thornley being with him. The train was standing on the side track about thirty five yards above the depot. It was raining very hard, and they walked across the track and got on a coach; but finding it locked, they stood on the platform until it was unlocked, when they went in and sat down in the smoking car, as Thornley was smoking. The conductor and brakeman were on the train when the plaintiff got on. When Gillingham, the plaintiff, and Thornley got on the platform, they were followed onto it by one Coffer, a young man very perceptibly intoxicated at the time. Plaintiff was entirely sober, not having drunk anything intoxicating that day, being orderly and well behaved as well as sober, making no disturbance of any kind during the whole transaction. But Coffer commenced kicking or pounding on the door, when the conductor went to the door, saw Coffer standing at the far side. Coffer looked and acted as if very drunk.

Therefore the conductor put his hand on Coffer's shoul-

der and said, "Young man you ought not to go on the cars this way, you might get hurt or killed and then I would be responsible for it." Coffer then put his hand down into his pocket and drew out an open knife, with a blade three or four inches long. The conductor stepped back into the car, picked up a coupling pin, went to shut the door, when Coffer raised the knife a second time. The conductor hit him on the knuckles with the pin and he Coffer threw the knife *"down like."* The conductor told him to get off the train or he would throw the pin at him, and picked it up for that purpose but refrained, but at the depot, sent the baggage master for a police officer. Witness Beatty, the policeman, came, when the conductor told him to arrest a man who was in the smoking car, who he was afraid would do him some harm. The policeman, conductor and another, passed out of the baggage car into the smoking car and there they found plaintiff Gillingham seated, Thornley smoking sitting behind him on the same seat with Coffer, Coffer having his head leaning on the back of plaintiff's seat. The conductor pointed out plaintiff and directed the policeman to arrest him. The policeman asked the conductor, "are you sure that is the man?" The conductor said he was, and that he had a knife. The policeman then ordered plaintiff to stand up and take out his knife, and the conductor came up and said he recognized the knife, and plaintiff handed it to policeman and pointing to Coffer on the next seat behind, said: "It was not me but that man." The policeman raising Coffer's head off the seat, asked Coffer what was the matter with him. Thornley also then said Coffer was the man; and Beatty, the officer, thinking there must be something wrong and that the conductor was mistaken, again asked him if plaintiff was the man, and the conductor told him he was *sure* he was the man, and to take him and hold him until he came back; then the policeman put handcuffs on plaintiff and started with him. Thornley went out on the platform and again told them plaintiff was not the man. The policeman led plaintiff through the street with the handcuffs on, first to his uncle's James Gillingham, and then to the office of the justice; and the conductor moved out with the train. The

justice tried the case on the merits, acquitted the prisoner and discharged him.

Plaintiff did not look like Coffer, in dress, size or otherwise. Plaintiff was sober, quiet and well behaved. Defendant asked the conductor as its witness: "Was the act of your pointing out the man as the one who had committed the assault upon you a personal one." He answered: "It was personally done." He further said: "Plaintiff had done nothing that he knew of in violation of the rules of the defendant company, had done nothing against its property, and that he himself was off duty as conductor, when the arrest was made, he thought; and that he honestly believed that plaintiff was the man who cut at him with the knife."

The defendant as a common carrier of passengers was bound to treat the plaintiff as one of its passengers respectfully, and carry him safely to Ben Lomond, the point his ticket called for. "Among the obligations which such a contract imposes are 'to protect the passenger against any injury from negligence or *willful* misconduct of its servants, while performing the contract, and of his fellow passengers and strangers, so far as practicable; to treat him respectfully, and to provide him with the usual accommodations, and any information and facilities necessary for the full performance of the contract on the part of the carrier,' and these obligations continue to rest upon the carrier, its servants and employes, while such contract continues and is in process of performance." *Dwinelle* v. *New York Cent. &c. R. Co.*, 44 Am. & Eng. R. R. Cases, 384–86 (1890) and cases cited on p. 386.

In *Harris* v. *Nicholas*, 5 Munf. 483 (decided in 1817) it is stated that "an employer or master is, in general, not responsible for a willful and unauthorized trespass, committed by his agent, overseer or servant."

But in *Crump* v. *U. S. Mining Co.*, 7 Gratt. 352 (decided in 1851) it was held that the principal is bound by the false representations of the agent, though he neither authorize them nor was informed of them. In *Tracy* v. *Cloyd*, 10 W. Va. 19, Haymond, J., in delivering the opinion of the court refers to the case of *Harris* v. *Nicholas*, cited

above, and also to Judge STORY's work on Agency. But the point was not involved and not decided; and in *Harris* v. *Nicholas*, it was only held, that where the act of the servant or agent was neither authorized by his principal, *nor committed in the usual course of his duty as such*, the master was not liable.

"The general maxim of the law subject to only a few exceptions, is that whatever a man *sui juris* may himself do, he may do by another; which is expressed by the maxim: *qui facit per alium facit per se.*" 1 Min. Inst. 225; 1 Bl. Com. 429. See editors in notes on this, 1 Hammonds Bl. Com. 719. See note 1 to § 451 of Greenough's Ed. of Story on Agency, who contends that it is service and not agency which makes the master liable for his servant's torts. However this may be, the modern doctrine is well settled, that "that which the superior has put the inferior in motion to do, must be regarded as done by the superior himself, and his responsibility is the same as if he had done it in person. The maxim covers acts of omission as well as of commission and embraces all cases in which the failure of the servant to observe the *rights* of others in the conduct of the master's business has been injurious," (Cooley on Torts 534) as well as those cases in which the servant has failed to perform, refused to perform or has negligently performed the duties due from the master to others in the conduct of such business; and the master is primarily liable to others for his own negligence in employing servants who are wanting in the requisite care, skill or prudence for the business entrusted to them, when by the exercise of ordinary care it would have been known; and in regard to passengers whom the carrier has bound itself to carry safely, whether such want of care, skill and prudence, could have been ascertained or not; for between the two, the carrier who has made the wrong possible, though innocent in other respects, must pay the damage or suffer the loss.

But what the servant thus does without authority, must be done in the master's service, must be in the line or within the scope of his employment. Masters "are responsible for the acts of their servant in those things that respect his duty under them, though they are not answerable for his

75

misconduct in those things that do not respect his duty to them." Lord KENYON C. J., in *Ellis* v. *Turner*, 8 T. R. 531 –533 as quoted in Bish. on Non-Contract § 612.

"So when a Railway company puts a conductor in charge of its train, and he purposely and wrongfully ejects the passenger from the cars, the Railway company must bear the blame and pay the damages. As between the company and the passenger the right of the latter to compensation is unquestionable." Cooley on Torts (2d Ed.) p. 626 and cases cited. Why? Not because the company authorized it expressly or impliedly—but, because it was the duty of the company to treat him properly and carry him safely. And it makes no difference, what was the conductor's motive for doing the act—how exclusively personal it may have been, or how foreign to the master's business then in hand, of transporting the passenger, if the act was in violation of the master's duty to the passenger, which it was the conductor's duty to discharge and perform as the master's servant and in the master's place. And the same principle applies to other acts in the same circumstances, such as assault and battery. *Stewart* v. *Brooklyn &c. R. R. Co.*, 90 N. Y. 588; 12 Am. & Eng. R. Cases, 127; *Bryant* v. *Rich*, 106 Mass. 180; 8 Am. Rep. 311; *Chicago & E. R. Co.* v. *Flexman* (Ill.) 8 Am. & Eng. R. R. Cases, 354; *Wabash R. Co.* v. *Savage*, (Ind.) 28 Am. & Eng. R. R. Cases, 288. See Thompson on Carriers of Passengers, notes to *Pendleton* v. *Kinsley*, p. 363; *Harris* v. *Somerville N. C. & S. R. Co.*, 35 Fed. Rep. 116, was a case of false imprisonment. See case of *Corbitt* v. *Twenty third St. R'y Co.*, 42 Hun 587 (1886) also a case of assault and false imprisonment.

Mechem in his work on Agency, § 740, gives the general rule as follows: "While, as has been seen, it is well settled that the principal is liable for the negligent act of his agent committed in the course of his employment, it has been held in many cases that he is not liable for the agent's willful or malicious act. In the language of Judge COWEN which fairly states the doctrine of these cases, 'The dividing line is the willfulness of the act.' " *Wright* v. *Wilcox*, 19 Wend. 345 (32 Am. Dec. 507). " The tendency of modern cases however, is to attach less importance to the

intention of the agent, and more to the question whether the act was done within the scope of the agent's employment; and it is believed that the true rule may be said to be, that the principal is responsible for the willful or malicious acts of the agent, if they are done in the course of his employment and within the scope of his authority; but that the principal is not liable for such acts, unless previously expressly authorized or subsequently ratified, when they are done outside of the course of the agent's employment and beyond the scope of his authority; as where the agent steps aside from his employment to gratify some personal animosity, or to give vent to some private feeling of his own." See cases cited.

Such seems to be the present modern doctrine as to passenger carriers, and founded upon public policy if not upon the principle already stated.

" False imprisonment is any unlawful physical restraint by one of another's liberty, whether in prison or elsewhere." Bish. Non-Contracts, § 206, and cases cited. "False imprisonment is a wrong akin to the wrongs of assault and battery, and consists in imposing by force or threats an unlawful restraint upon a man's freedom of locomotion." *Prima facie* any restraint put by fear or force upon the actions of another is unlawful and constitutes false imprisonment, unless a showing of justification makes it a true or legal imprisonment." Cooley on Torts. 196.

"An abuse of a lawful arrest is also false imprisonment; as cruelly treating the arrested person, insulting him, imposing on him undue hardships." Bish. Non-Contracts, § 210. "In false imprisonment proper, as distinguished from malicious prosecution, malice is not required," Id. § 212, but want of reasonable and probable cause is sufficient. "When the officer acting however honestly arrests the wrong person, not being misled thereto by the person himself, it is a case of false imprisonment." Id. § 213. The mistake may be shown in mitigation of damages. See cases in note.

We have seen that it is the duty of the common carrier of passengers to treat his passengers properly and respectfully and to carry them safely, and though not an insurer,

yet the law based upon principles of public policy, is strict and exacting in requiring their performance; and surely in this day when all the world is carried to and fro daily by instrumentalities vast in power and force, without constant vigilance and great care and skill almost as dangerous as forceful, owned by mere corporate entities, public policy is not likely to exact any less stringent rule.

The carrier is not only bound to safely carry and properly treat the passenger, but as far as may be to keep an orderly and well regulated house, for such in fact it is in these days, "protecting the passengers from the assaults of fellow passengers or trespassers during the subsistance of the contract of transportation," *Pittsburgh &c.* v. *Hinds*, 53 Pa. St. 512. Thompson on Carriers of Passengers, 295, and notes, see also opinion of Shaw, C. J. in *Comm.* v. *Power*, 7 Metc. 596–601 citing *Markham* v. *Brown*, 8 N. H. 523. And to enable the company to discharge these duties the more efficiently through its conductor, put as a living intelligent person to act as its representative in the flesh for that purpose, our statute has enacted that "the conductor of every train of railroad cars shall have all the powers of a conservator of the peace, while in charge of such train," section 31, chapter 146, Code 906 (Ed. 1891) thus giving him as conductor the shield and protection as well as the authority and power of the State, in keeping and enforcing law and order and protecting persons and property. This is a great thing for him, for his company, for his passengers, for the public at large. For him, not only because, he can in the discharge of his various and often perplexing duties, now speak and act with more confidence, with the State at his back, but as such conservator of the peace, "may properly be treated with more indulgence, because he is specially charged with a duty in the enforcement of the laws. "If by him an arrest is made with reasonably probable cause for belief he will be excused, even though it appear afterwards that in fact no offence had been committed." See Cooley on Torts 202. For the corporate master and owner, not only for these reasons but for the superadded one, that its duties to its passengers, its servants and the public, can now be more efficiently performed, through its living representa-

tive, put in charge for the purpose, and its widely extended property rendered more safe and secure. For the passengers, because their safety and well being can be better guarded; and for the State, as interested in the preservation of law and order as well as in all these things.

But there is nothing to indicate that it was the intent of the law-making power, to slacken the vigilance, or diminish the responsibility of the common carrier, or render it less liable for failure to discharge its duties than before.

Now, returning to the facts—there is little or no conflict in the evidence—and I have given them with some minuteness, and so far as the conductor details them, pretty much in his own language. We find that as a matter of fact, he had taken charge of the train as such conductor, whether the thirty minutes had fully run out or not. He was on the train, acted and spoke as the one in charge, chided and cautioned Coffer for his drunkenness, had the doors opened, received passengers, and made ready to start; in the meantime sending a subordinate for the police officer to make the arrest. In truth it is said for his defendant company, if not by himself, as matter of complete exculpation of the master, that he was acting as a conservator of the peace under the Statute, and therefore could not be acting in any other capacity. He could only be such conservator, as a superadded function to that of "conductor of a railroad train, while in charge of such train."

He caused to be arrested and handcuffed and led through the streets of Huntington in the open light of day without any reasonable or probable cause, a sober, orderly and well behaved young man, on the train as a passenger, who as he now says, as another ground of defence for his principal, had, in his own language, done nothing in violation of the rules of the Ohio River R. R. Co., done nothing against the property of the company, but had bought his ticket, was quietly seated on the train, waiting for it to carry him to Ben Lomond; and it was the duty of the defendant to cause that to be done, safely and properly as it had contracted to do, and it can not escape liability by laying the fault on its servant.

In *Craker* v. *Chicago &c. R. R. Co.*, 36 Wis., 657—a suit for

an assault committed by the conductor on a lady passenger —the same defence was made, as is set up here—that it was the unauthorized and purely personal act of the conductor, and not within the scope of his employment.

RYAN, C. J., in delivering the opinion, among other things, said : "And is the appellant here to contend that it has no responsibility for the flagrant violation of the contract which the respondent paid it to make and to keep by its sole representative appointed to keep it on its behalf? Like the English crown, it lays its sins upon its servants, and claims that it can do no wrong. We can not bend down the law to such a convenience. The appellant tortiously broke this contract as surely as it made it; committed this tort as surely as it made the contract." The willfulness of the servant's act is no excuse so long as it amounts to a breach of the contract (*Weed* v. *Railroad Co.*, 17 N. Y. 362;) nor the fact that the act is wholly disconnected from his duties, and a purely wanton assault.

In *Railroad Co.* v. *Finney*, 10 Wis. 330, the court held "that the proper rule was that where the misconduct of the agent caused a breach of the obligation or contract of the principal, the principal would be liable, whether such conduct be willful or malicious or merely negligent."

There are many other cases to the same effect, which need not be here cited, for here the wrong complained of was clearly in the line of service. It was done by the servant in those things that related to his duty under the master, and was not the "servant's independent tort committed outside the sphere of his employment." See Bish. Non-Cont. Law § 635.

Personal liberty is a natural right, "and, *prima facie*, any restraint put by fear or force upon the actions of another is unlawful, and constitutes false imprisonment, unless a showing of justification makes it a true or legal imprisonment." Cooley Torts, 196.

In this case the innocence of the plaintiff is shown beyond all question, not only by a trial and acquittal, but by the same evidence given under oath, by Thornley and others which was given by him and others without oath to and

in the presence of the conductor and police officer before and at the time they were making the arrest, now reinforced by the evidence of the conductor himself; and it must be remembered that Thornley had long known and knew well both plaintiff and Coffer and was present with the two from the beginning of the difficulty between the conductor and Coffer down to the time plaintiff was led away out of the car under arrest.

The conductor says he was so much excited that he could not use his ordinary prudence and carefulness, and thus made the mistake. That he did it by mistake, I think there can be no question. What motive could he have had to treat his passenger, Gillingham, in that way? None whatever, so far as this record discloses. But if he had listened at the time to those who knew, or had used ordinary care to examine for himself, or had taken the hint given him by the officer that he was acting rashly, and making a grave mistake, none would have been made; he would soon have come to his senses. But from some cause he failed to do this, and his mistake was not innocent in the eyes of the law, and the arrest was made without any reasonable or probable cause, of a passenger, whom it was the company's contract duty to carry safely to the destination mentioned in his ticket, for which very purpose, among others, he was put in charge of the train, so that the act, although in violation of his duty to the carrier as well as to the passenger, was clearly within the scope of his employment; and therefore the master is liable. The jury fixed the damages at one thousand dollars, and the trial court refused to disturb the finding.

But defendant by its counsel claims that the damages estimated should have been limited to the actual money loss sustained by plaintiff, for loss of time and actual expenses incurred by him in consequence of his having been put off the train; and that the jury should have been told that they could not give exemplary, vindictive, or punitive damages— terms often used indifferently in describing these damages. The exigencies of the case in hand do not call for any critical examination of the subject. For that I refer to the full and able discussion of the subject by the late Judge GREEN in

*Pegram* v. *Stortz*, 31 W. Va. 220 (6 S. E. Rep. 485) also pub-lished in 7 Am. & Eng. Ency. Law, 448, under the head of "Exemplary Damages." "Exemplary damages is the money given to the plaintiff by the jury as compensation for the injury inflicted by the defendant on the mental feelings of the injured person, such as his shame, degradation, loss of social position, and the like, resulting from the tort for which the action is brought." 7 Am. & Eng. Ency. 448. And in actions of tort, when gross fraud, malice, or oppression, or any wanton, willful, and deliberate disregard of the injured person's rights appears, the jury are not bound to adhere in computing it, to the determinable money loss or damages, but may give such damage as will be exemplary in keeping others from so doing, and the defendant from repeating like conduct. It may be smart-money as to the defendant, provided it be not an excessive or unreasonable *solatium* to the plaintiff. Sedg. Dam. (8th Ed.) c. 11. In this case the plaintiff passenger, entitled to proper and respectful treatment, was surely entitled to exemplary damages for the great indignity and humiliation to which he was subjected in being arrested, handcuffed and led away without the slightest pretext or cause for it whatever, except that the conductor persisted in closing his eyes and shutting his ears to those who knew, and both showed him and told him the real offender.

These were the main questions. Others, however, were raised and discussed, which should not be passed by. I need not give the amended declaration. It was in tort for false imprisonment and malicious prosecution, with the usual inducement of the circumstances, including the contract for transportation and the demurrer was properly overruled.

The court, at the request of defendant, directed the jury to find in writing upon three particular questions of fact submitted to them under section 5, chapter 131, of the Code. (1) "Was the arrest of Gillingham the result of an assault with a knife in the hands of one Coffer made upon Ebert (the conductor) while the train was upon the side track, before backing down to the depot for departure?" To this the jury answered, yes. This question was imma-

terial. If true, it was no bar. It constituted no complete defence, and therefore, not being inconsistent with the general verdict of guilty, it could not control the latter, and the court could not accordingly give a judgment on it.

Question No. 2 was the same in substance, under a slightly different form and was answered in the same way, and was properly disregarded by the court in giving judgment, and for the same reason.

(3) "Did Ebert (the conductor) have any authority from the defendant company to cause Gillingham's (the plaintiff's) arrest; and, if so, how, when, and by what official of said company was Ebert authorized to cause said arrest ?" The jury answered, "Yes ; from the Ohio River Railroad Company; " not giving the name of any special official, or the manner or the time of conferring such special authority. As we have already seen, no special authority from any official was needed. The liability of the company grew out of its obligation to answer for any injury inflicted upon the passenger by the willful misconduct or negligence of its servant, who was put in charge of the train for the purpose and with the duty of carrying the passengers safely. This special question also was, therefore, immaterial, and, if it had been answered as to the special official with a " No " instead of a " Yes," it would still have been the duty of the court not to permit it to control the general verdict.    *Kerr* v. *Lunsford,* 31 W. Va. 659, (8 S. E. Rep. 493) ; *Wheeling Bridge Co.* v. *Wheeling & B. Bridge Co.,* 34 W. Va. 155 (11 S. E. Rep. 1009) ; and the discussion of the subject and authorities cited by LUCAS, J., in delivering the opinion of the Court ; and *Peninsular etc., Man'f'g Co.* v. *Franklin Ins. Co.,* (14 S. E. Rep. 237) decided at this term.

Various exceptions were taken by defendant during the progress of the trial. One was permitting testimony to go to the jury of what occurred to the plaintiff after he was arrested and removed from the car. Plaintiff, as a witness, states in substance that the officer, Beatty, took plaintiff by way of Beatty's house to the office of 'Squire Taylor, where he was tried and acquitted. To that evidence I see no objection.

When the conductor was on the stand as a witness for defendant, counsel for defendant several times asked the witness for whom he was acting when he pointed plaintiff out to the police officer as the one to arrest, and whether or not this was a personal matter between the witness and plaintiff; whether he was acting in his own behalf or in his official capacity; and if any, what, authority he had for arresting or causing plaintiff to be arrested; or whether he was then acting within the scope of his authority as conductor of that Ohio River train, all of which the court for a while steadily refused to permit to be answered.

But the court, during the trial, did permit the witness to answer that there was no solicitation from any one to make the arrest, "only himself;" that his pointing out plaintiff *etc.*, "was personally done;" that he "was off duty at the time the arrest was made;" "that he honestly believed that Gillingham was the man that cut at him with the knife when he pointed him out to the policeman."

These questions and answers were permitted to go to the jury, being substantially answers to the questions before ruled out, so that we need not, at this point at least, consider these exceptions further.

Two instructions were given on motion of plaintiff, No. 1 and No. 2. Seven were asked for by defendant. No. 1, No. 2, and No. 4 were given, and No. 3, No. 5, No. 6 and No. 7 were refused. Instructions given on motion of plaintiff were as follows:

" No. 1. The court instructs the jury that if they believe from the evidence that theplaintiff without just cause was arrested after he became a passenger on one of the defendant's trains, and during the time that he was on such train, either by the conductor in charge of said train or by the policeman, Beatty, by order of the said conductor, that the act of the conductor, or of the said policeman acting under the orders of the said conductor, was the act of the defendant.

No. 2. The court instructs the jury that, if they find the defendant guilty, they are; in estimating the plaintiff's damages, at liberty to consider the expense and loss of time, if any, incurred by the plaintiff; also the bodily and mental pain and

anguish resulting from the defendant's acts as proved; and for the outrage and indignity and humiliation put upon the plaintiff to allow such damages as, in the opinion of the jury, will be a fair and just compensation for the injuries sustained, not exceeding the amount sued for."

Instructions on behalf of defendant, granted by the court, are as follows:

"No. 1. The court instructs the jury that the plaintiff can not recover in this case unless the acts done by Ebert in causing the arrest of the plaintiff were within the scope of his employment by the defendant railroad company; and such acts, to be within the scope of his employment, must be such as he would be usually and naturally called upon to do while discharging his duties as a railroad conductor in and about the business of the defendant railroad company.

"No. 2. The court further instructs the jury that it is not sufficient that the acts complained of were done during the time of the conductor's employment by the railroad company, or at the place where his duties called him to be. There must be something more, something which he was authorized by the defendant company to do, or which he did do while acting as such conductor, in the scope of his duties and employment."

"No. 4. That, unless the act done by the conductor in causing the arrest of the plaintiff was authorized by the railroad company, or was properly and legitimately within the scope of his employment, you must find for the defendant."

Instructions asked for by the defendant, but refused by the court, were as follows:

" No. 3. The fact that Ebert was employed by the defendant as a conductor of the passenger train upon which the plaintiff intended travelling is not sufficient evidence that he was authorized or employed to do the acts complained of; nor is that fact of itself sufficient to make the defendant liable for the acts complained of."

"No 5. That, if you believe from the evidence in this case that Ebert caused the arrest of the plaintiff while acting for himself, and upon his own authority, for his own

personal safety, without any direction or authority from the railroad company for so doing, you must find for the defendant.

"No. 6. The court instructs the jury that it was not lawful for the policeman to make the arrest without a warrant therefor, and that the defendant railroad company could not have legally procured the plaintiff's arrest in the manner in which said arrest was made, and that the defendant is not liable for the acts of Ebert which said company itself could not have lawfully done.

"No. 7. The court instructs the jury that, if they believe from the evidence in this cause that the plaintiff is entitled to recover anything, then, in estimating the damages, you are limited to the actual damage sustained by plaintiff for loss of time and actual expenses incurred by him in consequence of his having been put off the train, and you can not, in this case, give exemplary, vindictive or punitive damages."

I can see no objection to the instructions No. 1 and No. 2, given on behalf of plaintiff, if read in connection with No. 1, No. 2, and No. 4, given on behalf of defendant, of which there is no complaint. They are in harmony with, and substantially propound, the law, as we think, correctly. Plaintiff's No. 2 was approved in *Rickets* v. *R'y Co.*, 33 W. Va. 433 (10 S. E. Rep. 801). It means that, if plaintiff was a passenger on defendant's train, and during the time he was on the train to be carried to his proper station on the road he was arrested or caused to be arrested without just cause by the conductor in charge of the train, and that such act was within the scope of the conductor's employment, then such arrest would be the act of the defendant; that is, an act for which it might be liable. No serious objection can be made to instruction No. 2, given for plaintiff. It is drawn on the theory of exemplary damages as a *solatium*—damages restricted to what would, in the opinion of the jury, be a fair and just compensation for the injuries sustained or inflicted. *Pegram* v. *Stortz*, 31 W. Va. 220, (6 S. E. Rep. 485).

Instruction No. 3 of defendant was virtually given in giving defendant's instructions No. 1, No. 2, and No. 4, so

that, whether right or wrong, defendant has no ground of complaint in its refusal.

The same may be said of instruction No. 5, asked by defendant. It had already been given, and no complaint in this Court is made by plaintiff.

Defendant's instruction No. 5, taken as a whole, is not correct, for, if the arrest could not lawfully be made or caused to be made by the conductor without a warrant, that might add to the wrong, but would not relieve the defendant from liability for the false and groundless imprisonment of a passenger by the conductor in charge of the train, acting within the scope of his employment.

The refusal of defendant's instruction No. 7 has already been disposed of by what has been said on the subject of damages and in discussing plaintiff's instruction No. 2. In conclusion, we see no reason why we should set aside the judgment and verdict and award a new trial. The judgment complained of is affirmed.

AFFIRMED.