# CHARLESTON.

HORTENSE E. PAYNE *v.* OLINDA PENDELL PAYNE *et al.*

Submitted February 5, 1924.   Decided September 30, 1924.

1.   WILLS—*Test of Mental Capacity of Testator to Make Determined as of Time Will Was Made.*

In a suit to annul a will on the ground of mental incapacity of the testator, mere infirmity of mind and body due to a paralytic stroke is not sufficient to overcome the legal presumption of capacity in the testator; the true test of his mentality is to be determined as of the time the will was made and executed, and it must affirmatively appear that he did not then have mind sufficient to understand the nature and consequences of his act, the property to be disposed of and the objects of his bounty.   A case in which the principle herein announced is applied.   (p. 633.)

2.   SAME—*Undue Influence Must Be Such as Will Destroy Free Agency of Testator.*

If undue influence is charged, testator's weakened physical condition is to be considered, but the undue influence must be shown to be such as to wholly destroy the free agency of the testator and to substitute the will of another for his.   (p. 633.)

3. SAME—*Proceeding to Set Aside—Burden of Proof.*

In a chancery proceeding to set aside a will the burden of proving the due execution of the will and the testamentary capacity of the decedent is upon the proponents. The burden of proving undue influence, however, is upon the contestants. (p. 633.)

4. SAME—*Similarity of Will Sought to be Impeached to a Former One a Circumstance Tending to Show Testator's Competency and Rebut Undue Influence.*

The fact that the will sought to be impeached is very similar to wills formerly executed by testator when unquestionably in possession of his faculties, and that it merely modifies or supplements the provisions of such prior wills so as to meet changed conditions, is a circumstance tending to establish testator's competency and to rebut the charge of undue influence. (p. 638.)

5. SAME—*Virtues or Solicitations of Wife Which Do Not Destroy Free Agency Not Grounds for Setting Aside.*

The influence which a wife, by her virtues or solicitations, exerts over her husband, causing him to make a will in her favor, constitutes no ground for setting it aside, unless her influence over him amounts to force or coercion destroying his free agency. (p. 642.)

6. SAME—*Feelings of Testator as Disclosed by Letters to Beneficiaries May Be Considered in Determining His Intentions and State of Mind.*

In determining whether a will as executed represents the true intentions of the testator, it is sometimes necessary to inquire into the feelings of the testator toward his beneficiary over a considerable period of time. To this end, letters written to testator by his son, which would naturally tend to increase testator's affection for his wife, later his chief beneficiary, and to lessen his regard for his daughter, the contestant, and letters written by testator to his wife, indicating his affection for her, are admissible as proof of testator's state of mind. (p. 644.)

7. EVIDENCE—*Objection to Admission of Letters From Husband to Wife Will Not Be Sustained on the Grounds of Their Privileged Character, When Not Admitted to Reveal Anything of Confidential Nature.*

While all letters from husband to wife are presumed to be confidential, if the purpose for which they are sought to be admitted is not to reveal any thing of a secret or confidential nature, objection to their admission on the ground of their privileged character will not be sustained. (p. 644.)

McGINNIS, JUDGE, absent.

Appeal from Circuit Court, Harrison County.

Suit by Hortense E. Payne against Olinda Pendell Payne. Decree for plaintiff, and defendant appeals.

*Reversed and rendered.*

*Hoffman & Templeman,* for appellee.

*Melvin G. Sperry, R. S. Douglas, Carter & Sheets* and *Steptoe & Johnson,* for appellants.

MEREDITH, PRESIDENT:

Hortense E. Payne, one of the beneficiaries of the will of her father, Amos Payne, deceased, brought this suit to impeach the will, and after a finding in her favor by the jury to which the issue was submitted, the circuit court of Harrison County entered its decree declaring said purported will and the probate proceedings confirming the same to be a nullity. Olinda Pendell Payne, also a beneficiary under the will, the widow of the testator, resisted the suit in the circuit court and, together with the Clarksburg Trust Company as administrator with the will annexed appeals from the circuit court's decree. As the Clarksburg Trust Company's interest is largely formal, we shall, when using the term "appellant" have reference to the widow, Olinda Pendell Payne.

Two issues arise in the case:

1. Whether the testator was mentally competent to make the will, and,

2. Whether undue influence was exerted on the part of Olinda Pendell Payne, the widow and chief beneficiary.

A finding that the testator was mentally incompetent would of course preclude the necessity of determining the second question. We will therefore consider the inquiries in the order in which we have put them.

Amos Payne, a native of Harrison County, married early in life and with his first wife lived for a time in the state of Missouri. Four children were born of that marriage, Hortense, the contestant and appellee in this case, Henrietta, Thomas and Louis. In 1877 the first wife died and about 1879 the family returned to Harrison County. Thomas died in 1902, Henrietta in 1909, and Louis in 1919, all without issue, leaving only Hortense, who was married and about

fifty years of age when she instituted this suit. Amos Payne married the appellant in 1901; she was a lady of attainments, and the union, so far as the husband and wife were concerned, seems to have been a happy one. Not so however with the two daughters, particularly the appellee. Although there is evidence that she was anxious for her father to remarry, it was not long after the ceremony until misunderstanding and bickering began to disunite the daughters from their parental home, and since 1903, or about that time, she has not resided there, but in other property belonging to her father. Decedent and appellant from that year until his death lived in an apartment in the Payne Building, erected by the decedent on Pike Street in Clarksburg. That building is valued in the appraisement at $40,000.00, about half of the whole estate, and the apportionment of it in the will is perhaps the chief cause of this litigation.

About noon on Saturday, April 17, 1920, decedent at the age of seventy-four years, while in the lobby of the Gore Hotel, suffered a stroke of paralysis which affected the entire left side of his body. He was removed to his home in a semi-conscious condition and never left his home thereafter, his death occurring June 21, 1920. While very ill he executed his will on Monday, April 26, 1920. It is essential that we consider the circumstances of its execution, paying particular attention to the testator's physical and mental condition. Before doing so, however, in order that the object of the suit may be more clearly understood, we think it proper to call attention to the more important provisions of the will itself.

As stated, the instrument bears date, April 26, 1920. It was drawn by John C. Southern, testator's attorney, and is witnessed by E. B. Deison, a banker, and by J. W. Johnston, testator's personal physician. It contains thirteen paragraphs. To his wife, Olinda Pendell Payne, testator gave the following properties:

1. Fee simple interest in a house and lot purchased from Alexander C. Osborne, appraised at $10,000.00.

2. Eighty-one shares of stock in three banks in Clarksburg and Bridgeport, appraised at $15,505.00.

3. Twenty-two shares of stock in the Lee and Parr Hardware Company, appraised at $4,400.00.

4.  All of testator's government bonds, appraised at $1,864.00.

5.  All of testator's household goods, including a piano and an automobile, together appraised at $550.00.

6.  Certain Jackson lots on Haymond Alley, appraised at $4,000.00.

7.  Fee simple interest in the eastern one-half of the Payne Building, the whole of which was appraised at $40,000.00.

8.  All of testator's oil and gas royalties and holdings, appraised at $690.94.

9.  One-half of the residue of the estate after the specific devises and bequests contained in the will.

To Hortense E. Payne, the contestant and appellee, testator gave properties as follows:

1.  Life estate in the western one-half of the Payne Building, remainder in fee to her children, or if she should die without children or descendants surviving, then the remainder to the widow, Olinda Pendell Payne, in trust, the proceeds to be used for the erection of public comfort stations and resting places in Clarksburg.

2.  Seven shares of stock of the Merchants and Producers Bank of Salem, West Virginia, appraised at $1,225.00.

3.  Half interest in the residue of testator's estate, after the bequests and devises aforesaid.

Testator also made various small bequests to other relatives and friends, including a gift of $100.00 to Mrs. Louis M. Payne, the widow of his deceased son. It is clear that appellant, Olinda Pendell Payne, received a much larger share of the estate than did the daughter who prosecutes this contest.

It is undisputed that from the date of the stroke, April 17th, until his death testator was without the use of his left leg and arm, and it seems equally clear that during the earlier part of his illness his speech was seriously impeded. To some extent he gradually overcame this impediment, and there were times, according to several witnesses, when his articulation was clear and distinct, though perhaps more deliberate than when he was in good health. From the very first day of his confinement until his death he was the recipient of a great many social calls, and it is by these visitors, by his relatives and by his doctors and nurses that we are informed as to his con-

dition. About a dozen of these visitors were called to testify on each side of the case. His personal physician, Dr. Johnston, who was in daily attendance and who was a witness to the will; his lawyer, John C. Southern, now Judge of the Criminal Court of Harrison County, who drafted the will; one of his nurses, Mrs. Rosa Stuart Davis; and Dr. Zimmerman who administered Swedish Masseur treatments during the last three days of the testator's life, testified for the proponents. Dr. Louchery, who paid two friendly calls during the latter part of May; Dr. Timberlake, who observed the testator during the period from four to seven days after his stroke; Mrs. Romine, sister of the testator, and Walter S. Harden, who was in attendance as nurse, testified on behalf of the contestants. As we have stated, the social callers gave evidence upon both sides of the case.

The manner of the will's execution is not seriously disputed. It appears that on the evening of Friday, April 24th, attorney Southern, who had drafted two prior wills for the testator, was called to the Payne residence for the purpose of preparing a new will in their stead. Mr. Payne was placed in a chair, but before he was able to make his wishes clear he fell asleep. Southern, being reluctant to arouse him, suggested to Mrs. Payne that when he awoke she should make notes of the changes her husband desired to make in the disposition of his property, and that he would return on the following day and incorporate them into a new will. Mrs. Payne followed the suggestion, prepared the memoranda, and on the next day, Saturday, Southern, using them as a basis, prepared the new will. By error he omitted a minor bequest, and it was necessary to make a further change, which he did on the same day. The finished draft was left at the home until Monday, at which time, having been read to the testator, once by Dr. Johnston, and twice by Southern, it was signed by Payne in the presence of Johnston and Deison as attesting witnesses. Mr. Payne's signature, while halting and not written evenly on the line, was, it appears, legible. There is no dispute as to this bare outline of the circumstances surrounding the preparation and signing of the instrument unless it be as to the reading of it to testator by Dr. Johnston. The doctor seems

a bit confused on this point. He first testified that he read it to the testator in the presence of Deison and Southern, but as their examinations showed that this could hardly have been so, he later corrected himself by stating that his reading of the will took place on the Saturday night preceding its execution. The controversy is as to testator's mental competency to dictate the provisions of his will and as to his ability to understand what he was about, both when he directed its preparation and when he executed it. And there is, of course, the additional question, which we are not stressing at this point, whether he was unduly influenced by his wife or in her behalf.

Dr. Johnston speaks first in the record. He was called to administer to Mr. Payne immediately after the stroke, and having stated that he found his left side completely paralyzed, he was asked this question: "Aside from the condition of parlysis what did you observe about him?" To which he replied: "Nothing in particular, further than that he was paralyzed." He located the trouble as coming from a blood clot on the opposite side of the brain, and states that beginning about a month after the stroke Mr. Payne gradually regained some slight control over his arm and leg. The patient's speech also was affected, and the witness says: "Well, he talked quite a good deal, but at first it was very hard to understand him. . . His words would be very indistinct and rather hard to keep up with his conversation at times." What he did say concerned general topics, but his memory was markedly affected, and "he did not seem to realize a great deal for the first four or five days, did not seem to realize scarcely anything." After a week or ten days his speech improved, however, and within five or six days from the stroke his memory became more active. After a week or ten days he answered questions, usually very promptly. In response to two questions the doctor summed up his patient's condition as follows: "He would not converse with you at all for three or four days, and when he did it was a mumble and you could not understand scarcely anything, and nothing audibly." After two or three days "he could converse with you and you could understand him fairly well. Of course, some words, they

*was* rather hard for him to say. His tongue was partially paralyzed from the pressure there, and it was right hard or difficult for him to speak so that it was audible.'' For three or four days after the stroke it also appears that the patient had difficulty in distinguishing from day and night, did not realize where he was, thought he was at the Gore Hotel and wished to be taken home. While the doctor was reading the will it seems that the testator listened intelligently and interrupted the reading at one point to explain his reasons for including the provision for the comfort stations. He explained to his attorney in Dr. Johnston's presence that he had cancelled the old will because of the death of his son Louis and wished the new one to be like it except for certain changes he desired to make, and at the time he executed the final draft, the doctor saw nothing to indicate that the testator did not know what he was doing. As to this he says: ''From the conversation I heard that day I would say he was rational enough to make a will.''

Judge Southern adds little to the testimony of Dr. Johnston. He says, as did the doctor, that Mr. Payne had some difficulty in making his words clear, but he read the will over to him, and was of opinion that the testator was of sound mind and memory.

Mrs. Rose Stuart Davis, testator's nurse, was a convincing witness for the proponents. She was with him from noon until 5 o'clock each afternoon from the day of his stroke until his death, and while stating that he was feeble, and talked with difficulty, especially during the first three or four days after he was stricken, nevertheless, even during that period he answered questions as to his condition. His memory was good at all times when she was with him, and he seemed to have a very good mind except when he was tired after having company.

Mrs. Maggie Stewart was a half-sister of Amos Payne. She visited him daily during his whole illness. She was suffering from a fractured arm at the time, although Mr. Payne had apparently not known of it. On the Tuesday following his stroke Mr. Payne noticed her arm was bandaged and inquired sympathetically as to her accident, at the same time recalling an

occasion when he had suffered a broken leg many years before. There seems to have been no time when he was not able to converse with her about his condition, as well as matters of household concern.  On the day after he executed his will he said to her:  "I remembered Dever" (Mrs. Stewart's son) —"I left him one hundred dollars, or the value of a Liberty bond."  This was the fact as the will shows.  Mrs. Stewart, from her observation of the circumstances we have recited and many others, was of opinion that the testator was perfectly able to make a will disposing of his property.

We could review in great detail the testimony of the dozen or more other witnesses who called upon Mr. Payne during the various stages of his illness.  Some were there many times, some only once or twice, some shortly after he was taken down, others shortly before his death.  It is fair to say that all noticed that he talked with some difficulty, especially at first, and that he was restless and uncomfortable.  To show his mental competency they were asked concerning the matters which they discussed with him.  As some of these conversations occurred several weeks after the execution of the will, their relevancy would be more or less remote, but as their evidentiary weight depends not so much upon the character of any particular conversation, but rather upon them as a whole, we think it unnecessary to analyze them with chronological accuracy.  At various times he conversed on such matters as the health of the members of his visitors' families; the failure of his fellow lodge members to visit him frequently; the quality of a shave which his barber administered; his appreciation of flowers which he had received; his admonition to the janitor to keep the halls clean; and a discussion with an acquaintance relative to the advisability of leasing certain tracts of coal land.  These are but samples of the conversations which testator carried on at different times, but they serve to reflect the condition of his mind during his illness.

We have already named the chief witnesses for the contestant, Dr. Louchery, Dr. Timberlake, Mrs. Romine and Mr. Harden.  Dr. Louchery, who had known Amos Payne for a period of fifty-five years, called upon him twice during the

latter part of the month of May. He found Mr. Payne weak and restless, at times capable of starting a conversation, while at other times his mind wandered and his thoughts were disconnected; and "one of his principal difficulties in talking was that the muscles of the tongue did not respond necessarily to the nervous impulses." From these circumstances and others the doctor was of opinion that Mr. Payne was entirely incompetent to transact business.

Dr. Timberlake visited decedent twice during his illness, once from four to seven days after he was stricken, and again about a week later. On both occasions he was accompanied by a friend, Ed McDonald. On the first visit Mr. Payne recognized McDonald by calling him "Ed," but gave no sign of recognizing Timberlake, and to the latter the speech of the decedent was too indistinct to be understood. When the doctor called again Mr. Payne seemed a little brighter, but gave no positive sign that he recognized Timberlake. About all that the doctor understood during a stay of fifteen minutes or more was Payne's inquiry of McDonald whether the latter thought there was any chance of his recovery. While Timberlake did not consider the testator a "lunatic or anything of that kind," and while he seemed to understand what was said to him at times, nevertheless the witness didn't see how any man in his condition would be capable of transacting any business.

Walter S. Harden was on duty as a nurse almost constantly from Sunday, April 18th, until Mr. Payne's death. His description of his patient's physical condition is largely repetition of what others have said. At times he could understand what Payne was saying, at other times he could not, and he testifies that during the first week or ten days Payne seemed to think he was at the Gore Hotel and wanted to be taken home. He also was prone to confuse the different stories and anecdotes with which his visitors entertained him. The bulk of Harden's testimony, however, concerns Mrs. Payne's taking of the memoranda which were used by Southern in drafting the will. He describes in detail the circumstances of that incident.

Mrs. Olivia P. Romine was two years younger than her
97 W. Va.

brother, the testator, and stayed in the Payne apartment assisting in the care of her brother for two weeks after his stroke. As did the other witnesses, she testified in some detail as to his physical incapacity, but she also had some opinions, based on her observations, as to his mental condition. She relates, as did the others, his delusion that he was not at home, and tells how she had a friend, Mr. Parr, tell him that they had gotten him home. To this testator replied: "How did you get me up the stairway?" The time of this incident is fixed as a few days before the execution of the will. As to his memory Mrs. Romine says: "I don't think he had a very good memory. He seemed to know some things, but he did not have much reasoning power, I don't think. It just seemed like he would think of something and then he would go off to sleep or something else." And as to his testementary competency, she says: "I formed an opinion that he was not capable of making a will without somebody to assist him a good deal." She formed this opinion when she heard he was going to make his will, and states: "But I thought it was as he told me what he wanted done with his property, I thought it might be possible that he had it in his mind so that he could make it with a little help, may-be." Mrs. Romine was not in the room while Mrs. Payne was taking down the notes, except to enter for a few minutes to remind them of Louis' wife, whom she thought ought not to be forgotten.

As in the case of the witnesses for the proponents we could set forth at length the observations of the eight or ten other witnesses for the contestants. But their testimony also is of somewhat remote relevancy. They were visitors who called at different times, and their testimony relates chiefly to the testator's restlessness and difficulty in speaking. There is one point on which they are more or less uniform, however, in that in response to questions on the matter, they agree that in their opinion decedent was not in condition to transact business, or, as stated by some, he was not competent to make a will.

We think we have made a fair statement of the record on both sides of the issue as to testator's competency. We have

reviewed the observations of those who saw in decedent's condition nothing more than the natural physical debility resulting from a severe stroke of paralysis and their statements as to his noticeable rallying from the stroke after a few days. We are convinced beyond doubt that for a week or two at least he was unable, because of the impediment in his speech and his weakened condition, to express his thoughts as readily and clearly as before. We notice the statement of one nurse that his memory seemed good, and of the other that he could not make himself understood. We notice particularly his statement to his half-sister, Mrs. Stewart, that he had remembered his nephew with a small bequest. On the other hand, we could not dismiss altogether the conclusions of those who thought him incapable of transacting business, although the transaction of business, be it stated, is something different from making a will. One may ''want the capacity to transact many of the ordinary business affairs of life,'' and yet be mentally capable of understanding the disposition of his property. *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493.

In connection with this phase of the case we think it is now time to call attention to one circumstance which in our view outweighs many of the opinions of the witnesses called. We have already stated that Amos Payne had executed two prior wills, the last of which he had cancelled upon the death of his son, Louis. The first bore date January 7, 1917, the latter one, very similar in character was executed December 1, 1917. The latter was cancelled on November 7, 1919, by a pencil note at the bottom of the instrument. If the will thus cancelled, executed when Payne unquestionably was in full possession of his faculties, is similar in its contents to the one finally adopted, there is no doubt but that such a circumstance is significant as tending to show a continuation of intelligence respecting his testamentary wishes. In *Kerr* v. *Lunsford,* *supra,* the same proposition was considered, and we there said:

> ''It is not questioned in the case, that the testator was fully competent to execute a will in 1879. This will was clearly admissible on the question of capacity to execute the will in question, because it is similar in its provisions and tends to

show a steady and fixed purpose as to the manner
in which the testator intended to dispose of his
property. The same may be said of another draft
of a will, not executed, which was proved to have
been dictated by the testator.''

As we compare the will here assailed with the prior one
we find that as to the Osborne lot, the bank stock, household
goods, and oil and gas royalties, the provisions in both are
substantially the same, the only material change being that
a few shares of bank stock are bequeathed to the widow in-
stead of to the son, Louis. The so-called Jackson lots were
not mentioned in the earlier draft. The substantial change
in the two instruments concerns the devise of the Payne
building. In the will of 1917 that building was divided
equally between the two children, Hortense and Louis, each
receiving life estates, with power of disposition in case they
should have no children, and if such power was not exercised
the remainder over after the death of either to the surviving
brother or sister. The change was as we have noted in the
review of the contested will. By it the widow was given
one-half of the building in fee simple. The remaining half
went to the present contestant, Hortense Payne, for life, or
in case of her death with no children or descendants, the
revenue from the same to be used in the erection of comfort·
stations. This idea was not suggested in the prior will, but
Southern testified as to the testator's telling of his favorable
impression of such stations as he saw them in some southern
city. Of course, we do not know why Mr. Payne thought it
desirable to include the rather unusual provision as to the
comfort stations, but it seems to us that the change of the
devise of one-half of the building from his deceased son to
his wife, was a most reasonable thing to do. And it is note-
worthy also to call attention to the fact that certain annuities
which the former will prescribed should be paid to the sur-
viving widow by the children in case he should not erect a
building on the Osborne lot, were not mentioned in the sub-
sequent instrument. By the later will she was provided with
a residence. By the former she was not. Reading the two
wills together it appears to us that the one finally drawn

was a complete supplement to the one cancelled, bearing in mind the death of his son, Louis.

Counsel in their briefs have learnedly discussed the decisions relating to testamentary capacity, including several cases decided by this court. The principles are important and to some degree abstruse; especially is this true as regards the burden of proof and the presumption of the testator's capacity. In most states the law seems definitely settled that at least after a will is probated, the burden of proving testamentary incompetency rests upon the contestant. In Virginia there exists what seems to be a near anomaly in that while the burden of proof of competency is upon the proponent, the presumption of the testator's sanity nevertheless comes to his aid. *Hopkins* v. *Wampler,* 108 Va. 705. We would be reluctant to adhere to such an uncertain doctrine in any event, but in view of two decisions of this court, both prepared by Judge JOHNSON, we are not confronted with that issue.

*McMechen* v. *McMechen,* 17 W. Va. 683, was an appeal from the order of the circuit court refusing to admit a will to probate. Point ten of the syllabus, which is supported at length in the opinion, reads:

> "When a will is offered for probate, the burden is on the propounder to prove that the will was duly executed according to the requirements of the statute, and that at the time of the execution thereof, the testator was of sound mind and authorized under the statute to make a will."

*Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493, was a chancery proceeding in which plaintiff sought to set aside the will of decedent. Upon an issue *devisavit vel non* the question whether the will was the true last will and testament was referred to a jury. The proponents submitted the testimony of the two subscribing witnesses as to the due execution of the will, and as to the mental competency of the testator. They then rested their case, but were allowed to introduce evidence in rebuttal. In the opinion the court said:

> "Upon an issue *devisavit vel non* the proponents of the will have the affirmative of the issue

and the right to open and conclude the argument. *Coalter* v. *Bryan*, 1 Grat. 18; *McMechen* v. *Mc-Mechen*, 17 W. Va. 683; *Nicholas* v. *Kershner*, 20 W. Va. 259.

And further:

"In the trial of an issue *devisavit vel non*, it is the proper course to pursue for the proponents to offer the will and the evidence of its due execution and the competency of the testator at the time it was executed, and then having made a *prima facie* case to rest."

Clearly, under the principles above announced, the law of this jurisdiction is that it is the proponent in a proceeding like the present who carries the burden of proof as to testamentary capacity.

However, we have indulged in the foregoing review not so much from the necessities of this case as because we wish to satisfy the insistent arguments of counsel. We have detailed a large part of the evidence of the chief witnesses, and our conclusion, already squinted at, is that it could not be said from the proof as it stands now, that Amos Payne did not possess sufficient mental faculties to execute a proper will. It is undoubtedly true that he was physically enfeebled, and it may be true that his mind had lost much of its former vigor, but neither from the proof of his condition, nor from the circumstances of the will itself, could we say that he was incapable of recollecting his properties and of determining the manner of their disposition.

But, it may be suggested that the jury has condemned the will. Upon what ground did they do it? Because of decedent's incompetency, or because of undue influence brought to bear upon him? We do not and can not know. And from this arises the second question.

Despite the lack of proof of mental incapacity, if it be true, as alleged by appellee, that the testator in the execution of his will was subjected to illegal and undue influence exerted by his wife, the instrument would for that reason be inoperative, and on this issue the onus of the proof is clearly on the contestant. *McMechen* v. *McMechen, supra.* As in our

view the jury could scarcely have been convinced of the incompetency of the testator, it is upon this second point that the verdict probably turned. Its importance is thus readily apparent.

We have already narrated in outline how the contents of the will were put in memorandum form by testator's wife, the appellant, and subsequently reduced to legal form by Attorney Southern. We have not, however, related any of the details surrounding this transaction. It is undisputed that Mrs. Payne in the presence of the nurse, Harden, sat near her husband and wrote on several sheets of paper the provisions to be incorporated in the will. It is her position that the matters so set down were the voluntary wishes of the testator. It is the contention of Hortense E. Payne that the provisions were in fact substantially dictated by the wife, and that in his weakened condition, Amos Payne was too feeble to resist the influence so exerted.

As Harden was the sole witness to the proceeding, it is upon him that the contestant relies principally for proof. Were there space to relate all of his evidence, it would scarcely be necessary, as it is sufficiently illustrated by one or two examples. He testified that Mrs. Payne with a list of the property to be disposed of sat at her husband's side and interrogated him as to his intentions by questions of the following character: "Who do you want to have the Clarksburg bank stock, do you want me to have it?" And in reference to the Payne building, "You want me to have the east side?" and "Do you want Tensie to have the west side?" Mr. Payne would shake his head in such a manner as to her to indicate assent in response to each question, and, so far as Harden's testimony shows, the testator registered no audible disapproval of any suggestion. Mrs. Romine entered the room for a moment to suggest a bequest to Louis' widow, to which Mrs. Payne replied: "We have already fixed that," and "We don't want any one in the room but Mr. Harden and myself." The examples given are representative of Harden's testimony and form the basis of the contention that the influence attempted to be exerted was improper.

As on the first issue we are supplied with a multitude of authorities, and like it the principles applicable seem well es-

tablished in this jurisdiction. They are succinctly stated in *Stewart* v. *Lyons*, 54 W. Va. 665, 47 S. E. 442, as follows:

> "The influence resulting from the attachment or love, or mere desire of gratifying the wishes of another, if free agency is not impaired, does not affect a will. The influence must amount to force or coercion destroying free agency; it must not be the influence of affection or attachment; it must not be mere desire of gratifying the wishes of another, as that would be strong ground to support the will; further, there must be proof that it was obtained by this coercion, by importunity that could not be resisted, that it was done merely for the sake of peace, so that the motive was tantamount to force and fear."

It is thus clear that the influence exerted, to be construed as improper and undue, must be of a decidedly controlling character.

And as to a wife the law is very liberal in its allowance of influence exerted by her in the way of demonstrations of affection, even to the extent of permitting requests and solicitations on her part. Thus in 28 R. C. L. page 147, we find the following statement:

> "The influence which a wife, by her virtues, gains over her husband's affection and conduct, whereby he is caused to make a will in her favor, is no ground for refusing to admit the will to probate. She may lawfully urge her husband to make a will in her favor, and a woman, in response to her husband's solicitation, may change her mind and make a will which she would not have made but for his influence. The fact that the wife of the testator is his chief beneficiary in a will excluding his son by a former marriage raises no presumption of undue influence."

To these contentions appellee replies, however, that in this case the testator's mental and physical condition were such as to render him more readily susceptible to the importunities of his wife, and for that reason the influence was undue. The principle contended for can not be doubted. "A person may

be of sufficient capacity to make a will if let alone and not unduly influenced, and yet not of sufficient capacity if unduly influenced. And it is also true that in determining whether influence is lawful or undue regard is to be had to the condition of mind and body of the person upon whom the influence is exerted." *Bacon* v. *Bacon*, (Mass.) 62 N. E. 990, citing *Griffith* v. *Diffenderfer*, 50 Md. 466, and *Mooney* v. *Olsen*, 22 Kan. 69.

The application of the principles here, however, presents another matter, and on that it is very pertinent to call attention again to the fact that the will as finally drafted was read to the testator, not once but several times, and at his behest a change was made as to a minor bequest. And this circumstance is a strong reply to another of appellee's contentions, namely, that in this case the chief beneficiary of the will was the one who reduced the alleged intentions of the testator to written form. That would truly in many cases be a strong factor in avoiding the will. *Riddell* v. *Johnston*, 26 Gratt. (Va.) 152. But, where, as here, the final form of the instrument is prepared by a disinterested attorney, and subjected to the testator's approval, the principle contended for loses much of its force.

With sharp and acrimonious description of the wife's manner of taking down the memoranda on the part of the contestant's counsel, and an equally vigorous defense thereof, and a parade of the years of the happy and congenial domestic life of the testator and his wife, by counsel for appellant, the matter went to the jury for decision, and the verdict was that the influence was not within the bounds of legal permission.

But at this point it is necessary to raise another and an important question. Appellant, at the trial, offered in evidence two groups of letters, one group of ten letters written by Louis Payne, son of the testator, to his father, during the period from June 26, 1911 to April 8, 1915; the second group consisting of twenty-eight letters written by testator to his wife, between May 6, 1902, and February 5, 1920. All were excluded, and appellants claim they were prejudiced thereby.

As the two groups of letters stand upon somewhat different

evidentiary footings, we will discuss them for the most part separately. The will as executed undoubtedly indicated a preferment of the wife over the daughter, the latter claims it was an illegally induced preferment. In this situation it became important, according to appellant's contention, to show the state of mind or feeling which the testator entertained towards his wife, on the one hand, and towards his daughter, on the other. The relations between these parties may have been such as to justify what would otherwise appear to be an inequitable distribution of the property. What would be more likely to influence testator's feelings towards his wife and daughter, argues appellant, than the letters written to him by his son? Not for the purpose, therefore, of proving the truth of any fact asserted in them, but for the purpose of proving what may have been the feeling of the testator towards his ultimate beneficiaries, were the ten letters offered in evidence. For the reason that the truth or falsity of the statements in the letter was not at issue, appellant contends that no objections to the letters on the ground of hearsay, or that they were mere ex parte statements of one not a party to the suit are maintainable. That they were received and read, and that they had a probable influence on the testator's state of mind is the argument for their admission a contention which the appellee vigorously assails. Opposing counsel cite a number of cases to support their positions.

In *Burney* v. *Torrey*, 100 Ala. 157, 46 Am. St. Rep. 3, a son of the testator by a former wife sought to set aside the will in which the testator's second wife was the sole beneficiary. It appeared that about ten years prior to the testator's death the contestant had abandoned his wife and two children, and the contestees offered in evidence a clipping from a newspaper published in a distant city and mailed to the testator's wife, to the effect that the contestant had remarried. The trial court sustained an objection to this evidence on the ground that it was hearsay. The Supreme Court of the state, however, while adjudging the clipping to be hearsay so far as contestant's second marriage was concerned, and therefore inadmissable to prove that fact, held that the clipping was clearly proper ''as tending to account for the fact that

testator made no provision for him in his will." And the court said further

> "If the clipping was true or believed to be true by Mr. Torrey it may have influenced his mind. On the other hand, if it was a fabrication gotten up to prejudice testator, and he was imposed upon by it, we are not prepared to say such information, brought to him under such circumstances, was not admissible on the issues prosecuted."

For this and other reasons the case was reversed.

In *Foster's Ex'rs.* v. *Dickerson,* 64 Vt. 233, 24 Atl. 253, the heirs at law of the testatrix sought to avoid her will on the grounds of unsound mind and undue influence. Fifteen letters written to her by remote relatives, beneficiaries under her will, were admitted in evidence. Their admission was urged as error, as to which the court in its opinion said:

> "The issue of undue influence, as well as that of her insanity, involves the mental condition of the testatrix. A person of a weak, flighty, vacillating mind may be unduly influenced by what would not in the least move to action a strong, well-balanced mind. Most of the testimony in regard to the mental condition of the testatrix, therefore, also bore upon the issue. The issue of undue influence also involved the relations of the testatrix with and her feelings towards the contestants and those who are named as the objects of her bounty in the instrument proposed for probate. The fact, unexplained, that she made no provision for her half-brother, and only to a very limited extent for her own sister, in the proposed instrument, would have a tendency to show that it was the product of undue influence. If, however, her relations with and her feelings towards the object of her bounty were such that the attempted disposition of her property was not unnatural, the fact that she thus passed over near relatives would not tend to prove undue influence. As tending to show her relations and feelings in this behalf, the fifteen letters, all of which had been in her hands, under such circumstances as to show that she must have known their contents, were admitted. The jury were carefully

instructed to make no other use of them. For this
purpose these letters were clearly admissible. Sev-
eral of them were written during the time the testa-
trix was confined in the insane asylum, and dis-
close the views and feelings which the writers enter-
tained in regard to that confinement. Their views
and feelings were such as would be likely to exert
an abiding influence upon the |testatrix, when
known to her. It was her knowledge of their con-
tents which rendered them admissible in this re-
spect. The letters written by the testatrix were
admissible, not only to show her state of mind
towards the contestants and those named as the ob-
jects of her bounty, but also to show her mental
condition| and capacity.''

The Supreme Court of Pennsylvania in *Miller* v. *Miller,*
187 Pa. 572, 41 Atl. 277, had before it a case in which con-
testants sought to set aside a will in which the testator had
preferred one of his sons over his other children. The daugh-
ter contended that the favored son had exerted undue in-
fluence on their father. The brother, however, argued that
the cause of the discrimination against his sister was the
habitual drunkenness of her husband, and offered in evidence
a letter from an entire stranger to the testator bearing out
that fact. The trial court admitted the letter, but the
Supreme Court, citing *Spence* v. *Spence,* 4 Watts (Pa.) 165,
and *Deitrich* v. *Deitrich,* 4 Watts (Pa.) 167, held that its ad-
mission was erroneous and for that and other reasons reversed
the case. In the brief reports of the decisions cited in that
case we find little to assist us on the present question.

The three cases above considered are the only one cited
which, to our minds, involve facts sufficiently analogous to
the case at bar to warrant extensive review, although others
bear some marks of similarity. We do not think it to be
contended here that the letters in question are admissible as
proof of testator's competency, the point decided in *Wright*
v. *Tatham,* 5 Cl. & F. 670. Nor could they be considered as
evidence of the facts therein stated relative to a course of
conduct involving the testator and his beneficiary, as in the
case of *Snell* v. *Weldon,* 239 Ill. 279, 87 N. E. 1022. Nor

is the case of *Re Barber's Estate,* 63 Conn. 393, 27 Atl. 973, 22 L. R. A. 90, where the letters of third parties, in reply to those of the testator, were admitted to prove testator's competency, of particular relevancy.

A few words as to the contents of the letters themselves may serve to illuminate the situation. Louis, it appears, lived away from home during the years 1911 to 1915, and seems to have experienced little success. The point of his letters, so far as the proponents are concerned, is that in all of them he took occasion either to speak of his stepmother in the highest terms, or to speak disparagingly of his sister, Hortense. In most of them he did both. His principal accusations of his sister were as to her association with one Freeman, characterized as a drunkard by Louis, and as to her very severe treatment of the writer. The natural result of these communications, if they were credited by the father, would have been of course to engender in his mind a greater regard for his wife and less for his daughter. Incidentally, contestant suggests, one result may have been a more ample generosity towards Louis, himself. As to this suggestion counsel and we can only surmise.

The few cases which we have discussed indicate that the courts have not been uniform in fixing the lines of admissibility and inadmissibility of evidence in contest cases. However, the drift of opinion is decidedly in the direction of liberality. Thus we find it stated in 40 Cyc. page 1155:

> "Where the grounds of objection to the validity of a will are fraud and undue influence, the evidence is permitted to take a wide range and it is declared that every fact and circumstance, no matter how little its probative value, which throws light on these issues, is admissible."

To this we should add, as other courts have done before us, that the great latitude allowed in the introduction of testimony must not be regarded as absolutely abolishing the rules of evidence. The entire history of the testator's feelings towards his relations is of the utmost importance in cases of this kind. All of the influence exerted upon Amos Payne during the entire period of his married life no doubt

found place in his testamentary wishes. A study of all of the forces comprising those influences is entirely proper and indeed necessary in determining whether his will as executed was a natural or unnatural expression. One of these forces would properly be the influencing of his state of mind by what he understood to be the opinions of his son. So we hold to the view of the Alabama and Vermont courts, as expressed in the cases of *Burney* v. *Torrey* and *Foster's Ex'rs.* v. *Dickerson,* that the son's letters should have been admitted in evidence, not as proof of anything therein stated, but that the jury might have had the fullest opportunity to become acquainted with Amos Payne's feelings towards his wife and daughter, and that it might judge for itself whether the disposition of the property as fixed in the will was such as he in fact contemplated and desired.

As stated in a preceding paragraph, the twenty-eight letters from Payne to his wife stand upon a somewhat different footing. They, too, indicate the extent of the testator's affections towards his wife and daughter, and are thus indicative of his state of mind, but they are declarations of the testator himself, communicated to his wife, and certain different principles govern their admissibility.

On the threshold, however, we find one proposition already established in this jurisdiction. In *Dinges et al.* v. *Branson,* 14 W. Va. 113, this court held:

> "The declarations of a testator, or grantor, made either before, or after, the execution of the instrument, are admissible evidence, where the issue involves the mental capacity of the testator, or grantor, at the time the instrument was executed, or undue influence exerted over him at that time."

But the contestant argues that as these letters were written by testator to his wife, they thus come within that class of communications known as "confidential," or more broadly, "privileged," and for that reason are not to be admitted.

As in the case of the letters written by Louis Payne, it may be useful to consider briefly the contents. Their dates range from May 6, 1902, to February 25, 1920. All of them

are of a personal nature, but so far as we can observe, nothing of a secret or private character is mentioned in any of them.   But slight reference is made to any member of the writer's family except the wife to whom they were addressed. For her he professes the greatest love and affection from first to last, never failing to express the wish that they could be together as soon as possible.   It was to prove this love and affection for his wife that the latter sought to have the correspondence admitted at the trial.   The circuit court refused to admit them, giving as its reason that being communications from husband to wife they were confidential and privileged, and that the only person possessing the right to put them in evidence was the person making the communication, that is to say, the testator.   By him alone, according to the court's ruling, could the privilege be waived; in support of which ruling there is cited Jones, Evidence, sec. 736.

Despite the insistence of counsel for appellee, and the wisdom of the circuit court, we believe they have fallen into error in the matter of refusing to admit these letters into evidence.   The section cited in Jones on Evidence is certainly authority for the proposition that the privilege of waiving the objection to confidential communications is personal to the sender thereof; but have not the court and counsel come prematurely to the conclusion that the matters sought to be shown here were of confidential character?   The only object sought here was to prove the affection entertained by testator for his wife, and thus account for his liberality to her in his will.   Was this an attempt to break the confidence reposed in her by her husband?   If not, we think it clear that they should have been admitted.

> "After the close of the marriage relation, either party may testify to matters which took place during the marriage, unless such testimony involves the disclosure of matters of confidence."
> Jones, Evidence, §737.

Investigation shows that the courts have experienced difficulty in determining what is and what is not of confidential character.   The many cases cited and discussed by Jones in the sections cited and by Wigmore (Evidence, 2d, ed. Vol.

V, §2336) are proof of this. However, the last named author (§2336) seems to properly analyze the problem when he says:

> "The essence of the privilege is to protect confidences only. This is inevitably required by the very nature of this class of privileges. The purpose is to insure subjectively the free and unrestrained secrecy of communication, divested of any apprehension of compulsory disclosure; and if the communication is not intended to be a secret one, the privilege has no application to it. The chief question must be, for the present privilege, merely whether confidence or secrecy is to be *presumed to have been intended,* in all marital communications, until the contrary appears, or whether the burden of showing the intention of secrecy should be upon the person claiming the privilege."

Later in the same section he answers this question by denying the contention of some who would privilege any and all marital communications, and by stating:

> "It is proper enough to maintain that all marital communications should be presumed to be confidential until the contrary appears; but if the contrary appears, there is no reason for recognizing the privilege."

Whether or not the contrary does appear must of necessity depend upon the facts of the particular case. We think it appears here. The only purpose for which the letters in this case were offered was to show the strong affection of the testator for his wife. None of the facts mentioned in the letters were of the slightest relevancy except as tending to show testator's attitude toward his wife. There is no reason to suppose that the writer had any desire to nurse this affection in secret. Its disclosure to the public could have prejudiced neither him nor his wife.

But, it is contended that the affection of testator for his wife was not an issue of proof in the case, that it was substantially admitted. True, there is other evidence of it in the record, not denied. But that does not render legitimate the refusal of additional proper evidence. No doubt this was a

difficult case for the jury to decide, and the parties were entitled to present their full case. The letters should have been admitted.

For the foregoing reasons we will reverse the decree of the circuit court, set aside the verdict, and remand the cause for further proceedings.

*Reversed and remanded.*