# CHARLESTON.

C. D. BOLTON, *as committee, etc., et al. v.* GEORGE W. HAR-
MAN, *insane, et al.*

## (No. 5115.)

Submitted March 10, 1925.            Decided March 17, 1925.

1.  DEEDS—*Incapacity Held Not Shown; Undue Influence Held Not Shown.*

    The issue in this suit raised by the pleadings is the validity of a deed alleged to be void because of the mental incapacity of the grantor, and because of undue influence on the part of the grantees. The evidence is conflicting. The decree is sustained under the principles established in *Buckey* v. *Buckey*, 38 W. Va. 168; *Delaplain* v. *Grubb*, 44 W. Va. 612; *Teter* v. *Teter*, 59 W. Va. 449; *Woodville* v. *Woodville*, 63 W. Va. 286; *Black* v. *Post*, 67 W. Va. 253; *Barnett* v. *Great-house*, 77 W. Va. 514; *Martin* v. *Moore*, 92 W. Va. 671; *Doak* v. *Smith*, 93 W. Va. 133; and *Payne* v. *Payne*, 97 W. Va. 627, 125 S. E. 818. (p. 519).

    (Deeds, 18 C. J., § 62.)

2.  SAME—*Deed Not Held Void Because of General Description of Land Conveyed, Where by Aid of Extrinsic Evidence It Could be Located.*

    If the description of the land conveyed in a deed be general, the deed will not be held void for uncertainty, if by the aid of extrinsic evidence it can be located and its boundaries ascertained. (p. 525).

    (Deeds, 18 C. J. § 62.)

    (NOTE:—Parenthetical references by Editors. C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Summers County.

Suit by C. D. Bolton, as committee of George W. Harman, an insane person, and others, against George W. Harman and others. From a decree for defendants, plaintiffs appeal.

*Affirmed.*

*Miller & Hepburn* and *Wm. H. Sawyers, S. M. B. Coulling, W. T. Ball* and *Sanders, Crockett, Fox & Sanders,* for appellants.

*Thos. N. Read* and *R. F. Dunlap,* for appellees.

LIVELY, PRESIDENT:

The object of this litigation is to set aside and annul a deed executed by Geo. W. Harman to Daniel H. Harman, trustee, dated December 8, 1919, conveying real and personal estate, on the ground that the grantor was insane and mentally incompetent to make such deed. The controversy, though the bill is filed by Geo. W. Harman's Committee, is largely between the children of Harman by his first wife, and Margaret L. Harman the second and present wife, and his children by her. Incidental to the main relief sought, is the question of the sufficiency of the description in the deed of the real estate situate in McDowell County, and purported to be conveyed. Plaintiff, and certain of the defendants who are children of the first wife, say that Geo. W. Harman was mentally incompetent to execute the deed, and it is void for that reason, and that undue influence was exerted over him by his wife, Margaret, and others at the time he signed it; and even if that contention be decided adversely to them, then, that the description of that part of the real estate lying in McDowell County is indefinite and inadequate to pass title thereto. The issue of undue influence is not insisted upon in the brief; the evidence fails to support the affirmative side.

George W. Harman was about 75 years old when he executed the deed, and had been a shrewd and successful business man and trader. By his first wife, who has been dead for about 30 years, he had six children, and by his present wife, seven children. He had conveyed lands to four of the children by his first wife; Rosa and Iager (children of the first wife) had not received any lands from him. On December 8, 1919, the date of the deed in question, he owned a valuable farm in Summers County, locally known as "Crump's Bottom," consisting of about 1500 acres; and an

undivided one-half interest in about 800 acres of mineral land in McDowell County on Mountain Fork of Big Creek; and a large amount of personal property, consisting of stocks in corporations, cattle, horses, farming equipment, and the like. It appears that about ten or fifteen years prior to the date of the deed in question he had executed a deed direct to his wife, Margaret, conveying to her for her natural life, "Crumps Bottom" and the mineral land in McDowell County, remainder in fee to the children by her, naming them. Later, two of them, T. W. Harman and Pearle Harman Fuller, having been provided for, and two other children having been born since the execution of that deed, he erased the names of Pearle and T. W. Harman and inserted in lieu thereof the names of the newly-born children, and reacknowledged the deed as thus changed. In July, 1919, he suffered a stroke of apoplexy, or paralysis, and began to fail in health and mentality. Several persons who observed him, say between that time and the 8th of December following, he acted queerly on occasions and was "off" as they expressed it. While visiting relatives in Virginia in November he acted irrationally. On the other hand, quite as many of his friends, neighbors and employees say they saw no change in his mentality, or weakening of mental powers, in the fall of 1919, until about the 22nd of December when he was sent to the hospital at Huntington. Holdren, the family physician, says that he frequently went to Harman's house that fall in attendance upon Harman's sick daughter, and saw him many times before December 8, and observed no change in his mentality. Doctors Cummins, Cooper and Van Sant, who observed him casually in and after November, say that he seemed to be lacking in memory, as he wanted to pay again a hospital bill contracted for removing his tonsils. They do not intimate that he was insane. W. R. Clark, a neighbor, (examined for plaintiff), who was a frequent visitor at Harman's home for many years, never discovered any mental trouble until about December 20th. Anderson, who married a daughter by the first wife, Greenlund, a neighbor, Cox, the ferryman, Oliver and Etta Agee, employees in the Harman home, saw no change until a few days before he was sent

away in the latter part of December.  It will be observed that there is a conflict in the evidence as to whether there was a failure of mentality in Harman prior to December 8th. W. R. Clark's evidence is peculiarly significant.  He talked with Harman on December 6th, two days before he went to Hinton to execute the deed, and Harman then told him he was going to Hinton to fix up his business.  Clark ventures the opinion that he was then sane.  Clark was a son of the justice or notary who had taken acknowledgment of the deed to the wife of the life estate in the lands, remainder to the children of the second wife, many years before, and had read the deed; he also was present when Harman later acknowledged the change in that deed when the names of Pearl and Webster (T. W.) were stricken out, and the names of Dora and Henry (born since the first acknowledgment) were inserted.  The preponderance of the evidence seems to be that, prior to the 8th of December, the grantor's mind was reasonably good.  About the 18th of December he began to show evidences of acute impairment of mind; and was later sent to the hospital for the insane at Huntington, where he is now confined.  At one time during his confinement, he was permitted to visit some of his relatives, but was soon returned. Dr. Guthrie, the superintendent of that hospital, and a noted expert on mental diseases, says he was suffering from senile dementia and hemiplegic psychosis, which means insanity following paralysis.  To the same effect is the evidence of Dr. Johnson, who says he was violent when admitted.  The evidence of those witnesses as to the mental capacity of Harman, who are interested in the result of the suit, has not been considered.  Their evidence is incompetent.  *Kerr* v. *Lunsford*, 31 W. Va. 659.

While evidences of insanity, or mental incapacity, as shown by acts of the grantor both before and after the execution must be considered as tending to establish incapacity at the time of the execution, all our decisions say that the material or critical point of time to be considered upon the inquiry as to the grantor's capacity, is when the deed was executed.  If his mind was clear at that time, and he was fully cognizant of what he was doing, the deed is valid.  The

evidence of the officer taking the acknowledgement and the persons present at the execution is entitled to peculiar weight. Reed, the lawyer who prepared the deed and took the acknowledgment, had been Harman's attorney for many years. He says that on the morning of the 8th of December, Harman accompanied by his wife, Margaret L. Harman, T. W. Harman, Daniel H. Harman and wife, came to his office and explained to him that years ago he had made a deed to his then wife, remainder to his children by her, and that he had learned that a husband could not make a good deed direct to his wife. He explained that he had made some change in the grantees and had re-acknowledged it after the change was made. He was perfectly rational. He desired deeds to be drawn which would be according to law, and gave specific and clear directions. No suggestion was made by the wife or the others present. The old deed was delivered to him (the attorney) and was the same as that described by Clark, whose father had taken the acknowledgment. Clark had read that old deed when acknowledged. He listed the personal property to be included, asking Dan Harman how many cattle there were. After giving full and clear details as to what property he wanted conveyed and to whom it should go, he and the others left the office while the papers were being prepared for execution. The deed to D. H. Harman, trustee, was accordingly prepared; and a deed from the trustee to the wife for a life estate, remainder to children by the second marriage was also prepared. Later in the day they were executed and delivered to the grantor, and two days later they were admitted to record in the county clerk's office. The description of the McDowell land was taken from the old deed, which deed was destroyed when the new ones were executed. Mrs. Craynon, Reed's stenographer, was sitting near in an adjoining room, and says she saw the grantor; that she heard him give the directions; that she knew him well; that she observed nothing to indicate he was not in full mental vigor; and she corroborates Reed's testimony in the important particulars. Harman, after leaving the attorney's office, transacted business with various persons in Hinton. He purchased galvanized pipe from Bowling, who

knew him well, having been a neighbor for four years, and talked with him on various topics for about thirty minutes. Bowling says he saw "nothing in the least" abnormal about him. He then went to Peck, an automobile dealer, and purchased a car, trading in as a part of the purchase price a used car belonging to T. W. Harman, who was present, and paying the balance by check, remaining with Peck about one hour. Peck saw nothing abnormal. From there he went to his bank, where he transacted business in the usual way. The bank officials saw no change in his mind or actions. From there he went to his dentist, Dr. Neely, who was doing professional work for him, and Neely discovered nothing abnormal. He consulted and retained another attorney that day, who says he was normal. In fact, the preponderance of evidence is that when the deeds were prepared and signed, the grantor was mentally capable to transact business. Even if the evidence as to his capacity was evenly balanced, this court would not reverse the finding of fact by the chancellor. And that is the rule even where this court might have decided differently in the first instance on conflicting and unsatisfactory evidence.

The presumption is that a grantor in a deed was competent to make it at the time of its execution. Age, infirmity, and eccentricities in the grantor will not alone vitiate the deed. If he be capable at the time of its execution to know, and does know, the nature, character and effect of the deed, it will be sustained. The burden is upon the one who seeks to cancel the deed, on the ground of incapacity in the grantor, to show that he did not have capacity sufficient to understand clearly the nature and consequences of his act. This case is governed by the principles announced in *Buckey* v. *Buckey*, 38 W. Va. 168; *Delaplain* v. *Grubb*, 44 W. Va. 612, 67 Am. St. Rep. 788; *Teter* v. *Teter*, 59 W. Va. 449; *Woodville* v. *Woodville*, 63 W. Va. 286; *Black* v. *Post*, 67 W. Va. 253; *Barnett* v. *Greathouse*, 77 W. Va. 514; *Martin* v. *Moore*, 92 W. Va. 671; *Doak* v. *Smith*, 93 W. Va. 133; and *Payne* v. *Payne*, 97 W. Va. 627, 125 S. E. 818. There seems to be no contention that Harman was without capacity when he made the deed several years ago conveying the "Crumps Bottom"

land and the McDowell land to his wife for life, remainder to his children by her, which was destroyed when the deeds under consideration were executed. There is little difference in the effect of the old and new. The personal property was included in the latter. This is a circumstance tending to establish the grantor's competency. 4th point syll. *Payne* v. *Payne,* 97 W. Va. 627, 125 S. E. 818. The deed of December 8, 1919, to D. H. Harman, Trustee, will not be declared void on the ground of mental incapacity of the grantor, or because it was executed as the result of undue influence.

We come now to the remaining point: Is the description of the McDowell County land on Mountain Fork of Big Creek, definite enough to convey title?

The description is: "A tract of 400 acres situate on Mountain Fork of Big Creek in McDowell County, West Virginia, and being a portion of an original tract of 1600 acres patented to J. C. Harrison by the State of Virginia, and being the same tract of land which adjoins Geo. L. Carter and others and is now leased to the said G. L. Carter by the parties of the first part under a coal lease, this deed being subject to the provisions of said coal lease." Is the description sufficient to locate the land? The description is general it is true. The land lies on a certain stream in a certain county and is a part of a tract of 1600 acres patented to Harrison, and joins Carter and others, and on which Carter has a coal lease executed by Harman and wife. No boundaries are given, no starting point is designated. Without the aid of other title papers, or extrinsic evidence it would be difficult for a surveyor to locate the land. Cooper, a civil and mining engineer and well acquainted with lands in McDowell County, says he was not able to locate a tract of 400 acres owned by G. W. Harman in that county. That he was not able to do so, is not conclusive that it cannot be done. The record shows that in 1860 the State of Virginia granted to John C. Harrison and Hezekiah Harman 1600 acres on Mountain Fork of Big Creek; that this tract was partitioned and the western half by metes and bounds set off and assigned to the heirs of Henry Harrison, and the order confirming the partition recorded in McDowell County Clerk's

Office on April 2, 1890; this western half, by metes and bounds, was afterwards conveyed by Special Commissioner Stokes to Geo. W. Harman. Conveyances were made to Pocahontas Coal & Coke Company, W. F. Harman and others. followed by a partition suit in which Lot No. 5 was assigned to Geo. W. and W. F. Harman, said lot containing 808.74 undivided acres, "one-half being owned by each", subject to certain rights of Hattie Harrison Stone. A map filed with the partition suit locates and identifies the land. This tract of 808.74 acres was leased by Geo. W. Harman and W. F. Harman and wives to the Virginia Pocahontas Coal Company for mining and removing coal, on January 14, 1913. It is shown that Geo. L. Carter was president and general manager of this coal company, and that this operation was locally known as "Carter Coal Company operation." The Carter Collieries Company, of which Geo. L. Carter was president and manager, owned adjoining tracts of land. It is shown that this was the only land in McDowell County owned by Geo. W. Harman on December 8, 1919, when he made the deed in question. We think there could be no doubt about the intention of the grantor to convey this particular tract of land. It was all he had in that county. It is true he owned one-half undivided interest in the 808.74 acres, instead of 400 acres. But would that vitiate the deed when, in fact, his part would equal what he deeded? Neither do we think there can be any doubt about locating the land. If the grantees cannot locate it, it is not perceived how it can be located and identified by the plaintiff. Devlin on Real Estate, Vol. 2 (3rd. Ed), Sec. 1012, well states the general rule: "If the description is general, the particular subject matter to which the description applies may be ascertained by parol evidence, and the deed will not be held void for uncertainty, if, with the aid of such evidence, the land intended to be conveyed can be located." See *Smith* v. *Owen,* 63 W. Va. 60, 59 S. E. 762; 8 R. C. L. page 1074, Sec. 129. It is well said that "What may be made certain, is certain."

The decree is affirmed.

*Affirmed.*